Anthony DODGE, Peter A. Machado and Joseph Petriello, individually and on behalf of all others similarly situated, Plaintiffs,

v.

COUNTY OF ORANGE and Sheriff H. Frank Bigger, in his individual and official capacity, Defendants.

Samuel Rango, Jarrod H. Mann, and Rocco Manniello, individually and on behalf of all others similarly situated, Plaintiffs,

v.

County of Orange and Sheriff H. Frank Bigger, in his individual and official capacity, Defendants.

No. 02 CIV. 769(CM)(LMS), 02 CIV.8451(CM)(LMS).

United States District Court, S.D. New York.

Sept. 9, 2003.

James Edward Monroe, Dupee, Dupee & Monroe, P.C., Goshen, NY, Robert N. Isseks, Middletown, NY, for Anthony Dodge.

James Edward Monroe, Dupee, Dupee & Monroe, P.C., Goshen, NY, for Peter A. Machado, Joseph Petriello, Samuel Rango, Jarrod H. Mann, Rocco Manniello.

Christina Sanabria, County Atty, County of Orange, Goshen, NY, Robert Groban, Epstein Bechen & Green, P.C., New York, NY, for County of Orange.

James M. Fedorchak, Gellert & Cutler, P.C., Poughkeepsie, Christina Sanabria, County Atty, County of Orange, Goshen, NY, for H. Frank Bigger.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

MCMAHON, District Judge.

This case began in January of 2002, when the complaint in *Dodge v. County of Orange*, 208 F.R.D. 79 (S.D.N.Y.2002) (*"Dodge"*) was filed. Plaintiffs brought suit pursuant 42 U.S.C. § 1983 ("Section 1983") and sought to represent a class of pre-trial detainees charged with misdemeanors who were admitted to the Orange County Correctional Facility ("OCCF") from January 1, 1999 to the present and allegedly subject to strip searches upon their admission to the facility that they contend violated the Fourth Amendment of the United States Constitution.

The plaintiffs in *Dodge* moved for a preliminary injunction against further unconstitutional strip searches at OCCF in February of 2002, and defendants moved to dismiss plaintiffs' complaint as moot. I denied defendants' motion to dismiss and granted plaintiffs' request for a hearing on their motion for a preliminary injunction. *See Dodge v. County of Orange*, 208 F.R.D. 79 (S.D.N.Y.2002). I also consolidated the preliminary injunction hearing with a hearing to determine whether class certification under Federal Rule of Civil Procedure 23(b)(2) was appropriate, or whether partial class certification under Rule 23(c)(4)(A) would be the best method for adjudicating plaintiffs' case.

A one-day hearing was held on June 24, 2002. Following the hearing, I granted plaintiffs motion for class certification pursuant to Rule 23(b)(2) and issued a preliminary injunction. *See Dodge v. County of Orange*, 209 F.R.D. 65 (S.D.N.Y.2002). The injunction enjoined defendants to con-

duct strip searches of newly-arrived inmates only when they had reason to believe the new arrival might be secreting contraband, based on (1) the nature of the crime charged; (2) the circumstances of the arrest; and (3) the particular characteristics of the arrestee. [DX 33].

On October 22, 2002, a second complaint, *Rango v. County of Orange*, 02 Civ. 8451 (S.D.N.Y.2002) (*"Rango"*) was filed. The *Rango* plaintiffs purported to represent a class of pre-trial detainees charged with *felonies* who were admitted to the Orange County Correctional Facility ("OCCF") from January 1, 1999 to the present and allegedly strip searched in violation of the Fourth Amendment of the United States Constitution. The *Rango* plaintiffs moved for a preliminary injunction soon after filing their complaint.

At oral arguments on the *Rango* plaintiffs' motion for a preliminary injunction, I deferred my decision on that motion pending an evidentiary hearing. The parties then agreed to consolidate the *Dodge* and *Rango* cases so that a single trial could be conducted on plaintiffs' requests for permanent injunctive relief in both cases. The consolidated trial was conducted over four days, between May 19 and May 28, 2003. At the trial, I heard testimony from twenty six witnesses and received into evidence voluminous exhibits from both parties. I was also given a personal tour of OCCF on May 29, 2003, at which I time I heard additional testimony from OCCF corrections officers.

Upon reviewing that evidence, together with the parties' post-trial submissions, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I. *The Orange County Correctional Facility*

OCCF is a county jail located about sixty miles northwest of New York City, in

a county that contains two of the poorest cities in New York State (Middletown and Newburgh), as well as a growing number of suburban developments that are beginning to impinge on the county's extensive rural areas.

For many years, OCCF was housed in Goshen, New York at 40 Erie Street. OCCF officials and counsel were frank in describing the jail as old and decrepit. On September 1, 2001, the County opened its new correctional facility, which is located in Goshen at 110 Wells Farm Road. As part of the trial, I was given an extensive tour of the facility, which is most impressive.

OCCF is a county jail. In the jurisprudence of the Second Circuit, county jails are not considered "prisons." *Shain v. Ellison,* 273 F.3d 56, 65–66 (2d. Cir.2001) (hereafter *"Shain"*).[1] However, at least in the more populous counties (and I include Orange County—one of the fastest growing counties in terms of population in New York State—in that group[2]), the county jail is not the local pokey, either. Accordingly, a description of the facility is both warranted and relevant.

OCCF is constructed as four separate modules, each of which contains three or four units. Each unit houses up to fifty-three inmates in a self-contained area, in which not only cells, but also recreation areas (both outdoor and indoor) and facilities for serving food are located. The facility has common areas for educational programs conducted by the Board of Co-operative Educational services (BOCES); medical treatment; personal grooming; and a common kitchen. It also houses administrative offices for jail personnel and the County Sheriff and recreational facilities for use by corrections personnel. (A diagram of OCCF is attached to this opinion as Ex. 1.)[3]

OCCF is surrounded by high metal fencing topped with barbed wire. It boasts guard towers and lights. It looks nothing whatever like a community lock-up; it is every bit as forbidding as the medium security federal prison I visited some years ago.

OCCF, like all county jails in New York, houses at least three classes of criminal inmates: persons accused of felonies who have not been admitted to (or made) bail; persons convicted of misdemeanors who have been sentenced to terms of imprisonment of less than one year; and persons accused of misdemeanors who have not made bail.[4] Every criminal detainee who arrives at OCCF has been arraigned. Alien detainees and persons who have been civilly committed are also housed in the facility. [Ryan Direct ¶ 21]. The County is presently negotiating with federal authorities to house certain federal detainees.

1. While the Second Circuit in *Shain* did not consider a county jail to be a "prison," the facility clearly falls within the definition of the term "prison" as used by Congress in the Prison Litigation Reform Act ("PLRA"), which defines "prison" as "any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law." 18 U.S.C. § 3626(g)(5).

2. According to the 2000 Census, Orange County is the eleventh most populous of New York's sixty two counties. Between 1990 and 2000, its population grew by eleven percent. Only three other counties (Putnam, Queens, and Richmond) grew at a faster rate. This information is available online at http://www.empire.state.ny.us/nysdc/census2000/pl94/ctytabl.pdf.

3. Due to security concerns, the diagrams provided by OCCF are incomplete and not to scale.

4. In New York State, all persons accused of misdemeanors must be admitted to bail pursuant to N.Y.Crim. Proc. L. § 170.10(7), as recognized in *Shain.* 273 F.3d at 65.

When multiple inmates are being transported to the facility (generally by the Orange County Sheriff's Department), no effort is made to segregate accused felons from misdemeanants or civil committees. Similarly, accused felons are not necessarily segregated from accused misdemeanants, sentenced misdemeanants, or civil detainees in the housing units. However, a person being detained for trial on a charge of rape or murder is unlikely to be housed in the same unit as a person who is delinquent on his child support, because New York State law requires that inmates be classified by perceived level of risk (high, medium, low) and housed with other inmates who share a similar risk assessment. Men and women are housed separately, and there is a separate housing unit for juveniles.

OCCF only accepts inmates after a court has issued a securing order that remands the inmate to OCCF until he can either raise bail or be tried on the criminal charges against him. [Ryan Direct ¶ 8]. Approximately thirty seven different local and municipal courts (and, on occasion, federal authorities) remand inmates to OCCF. The arresting agencies include the New York State Police (who serve as the police force for significant parts of Orange County) and the police departments of the various municipalities within the County.

OCCF has the capacity to house 786 inmates. [Ryan Direct ¶ 5]. At present its capacity is not taxed. An average of 530 inmates are housed at OCCF each day. The annual census filed with the State of New York show that just over 5,500 inmates passed through the institution in each of the years 2001 and 2002. In 2001, 36% of the inmates housed at OCCF were felony pre-trial detainees (2,009 inmates); in 2002, 42% were felony detainees (2,322 inmates). The rest are misdemeanants at various stages of the process (both pre-trial and sentenced), persons secured under civil commitment orders, and immigration detainees. This contrasts with Rikers Island, New York City's "local jail." Rikers consists of several different buildings, some of which (such as the Anna M. Kross Center) house up to approximately 3,000 inmates on any given day. [Tr. 182 (DeRosa Testimony)].

The record contains no data about how many new arrivals are/were received at either the old or the new facility on any given day. According to Capt. Joseph Ryan, the current daytime shift commander at OCCF, there are some days on which no new arrivals come to OCCF, while as many as thirty or more may show up on the five to ten busiest days of the year. [Tr. 99–100]. Corrections Officer James Ognibene III testified that the average number of new pre-trial detainees who were in-processed on a given day was about fourteen or fifteen, with seven to ten of those on the day tour and fewer at night. I find that the booking and receiving officers at OCCF are not heavily burdened with in-processing new detainees during the average tour of duty.[5]

## II. *Strip Searches*

I here emphasize that the only matter at issue in this case is the constitutionality of strip searching inmates who are arriving at OCCF for the first time post-arraignment or arrest. The case is not about the legality of strip searches conducted after contact visits, strip searches conducted after court appearances or work details, or

---

5. New arrivals are not the only persons who are in-processed at Booking and Receiving. Inmates who are coming in to serve weekend sentences, inmates returning from work details, and inmates returning from court are all in-processed at Booking and Receiving and should be distinguished from inmates—whether accused of misdemeanors or felonies—who are arriving at OCCF for the first time following arraignment.

strip searches conducted during cell shake-downs or when violations of contraband rules are suspected. Therefore, I will focus the rest of my findings of fact on that issue.[6]

First, however, it is necessary to define what a "strip search" is, because—as I have previously noted—the term means different things to different people. *See Sarnicola v. County of Westchester*, 229 F.Supp.2d 259, 272 n. 5 (S.D.N.Y.2002). According to the Orange County Correctional Facility Training Manual, a "strip search" is:

> a search of the inmate's clothes, once they have been removed, and a visual inspection of the inmate's naked body. This should include the inmate opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his arm pits, lifting his feet to examine the sole, spreading and/or lifting his testicles to expose the area behind them and bending over and/or spreading the cheeks of his buttocks to expose his anus. For females, the procedures are similar except females must in addition, squat to expose the vagina. [PX 8, at 13].

The Facility Training Manual elaborates on the strip search procedures, providing, in part, that the strip searching officer should "[c]arefully examine the inmate's groin"; that "a flashlight should be used, making it unnecessary to touch the prisoner at this point in the search"; and that the officer should "[r]equire the inmate to turn around, bend over and spread his buttocks" and "[t]hen, using the flashlight, look at the inmate's rectum to see if any contraband has been placed there." [PX 8, at 15].

### A. *The Penological Interest in Strip Searching*

OCCF houses inmates who present a wide variety of security risks. [Camp Direct ¶ 8; DX 5–11]. These range from maximum-custody inmates who are considered the most dangerous, to minimum-custody inmates who are considered to pose lesser security risks. [Camp Direct ¶ 8]. As both sides' experts testified, however, penal institutions must provide a perimeter security that addresses the *maximum* possible risk. [DX 50A (DeRosa Dep. 101); Camp Direct ¶ 8]. They also agreed that one of the primary security objectives of any correctional facility must be to prevent the introduction of "contraband" into a correctional facility due to the dangers that contraband presents in a correctional setting. [Tr. 432–33, 447 (Camp Testimony); Tr. 196–97 (DeRosa Testimony); DX 50A (DeRosa Dep. 17–18); DX 49B (Fraser Aff. ¶¶ 16–18) ].

In a correctional setting, the term "contraband" means anything that an inmate is not permitted to have in a correctional facility. Items such as money, cigarettes, or other materials that individuals can possess legally outside a correctional facility may be considered contraband, even serious contraband, inside a correctional facility. [Tr. 429, 433–34 (Camp Testimony) ].

Both William Fraser and George Camp (defendants' expert) testified credibly about the harm that contraband can cause within a correctional facility. The dangers

---

**6.** It is therefore not necessary for me to make detailed findings of fact about the wonderful educational and religious programs that are conducted at OCCF, or for that matter about all the ways in which contraband circulates among members of the general population.

Proposed findings on these and other irrelevant subjects take up numerous single-spaced pages of defendants' lengthy, argumentative, and heavily footnoted Proposed Findings of Fact and Conclusions of Law.

posed by weapons, ammunition, or drugs are obvious. Less apparent is the danger presented by money, cigarettes, or even excess prison issue items. All of the expert witnesses testified, including plaintiffs' expert, that even this "lesser" contraband can increase the level of violence and endanger the health, safety, and well-being of inmates, staff, and civilians in a correctional facility. [Camp Direct ¶¶ 8, 11; Tr. 433–34 (Camp Testimony); Tr. 196–97 (DeRosa Testimony); DX 50A (DeRosa Dep. 17–18); Tr. 395 (Fraser Testimony)]. The danger results from the unique environment that exists inside a correctional facility. Even seemingly innocuous items like money, cigarettes, or excess issue (extra sets of items that are issued to an inmate once he arrives at the jail, such as clothing or linens) can be used by inmates to barter, and thus be held over the heads of other inmates. [Tr. 433–34 (Camp Testimony)]. Barter tends to disrupt prison operations by allowing certain inmates, or groups of inmates, to exercise authority in competition with correctional staff. The use of even seemingly innocuous contraband in this manner can have serious and dangerous consequences. This is why both experts and Mr. Fraser agreed that the introduction of contraband into a correctional facility such as OCCF "endangers the safety and security of the inmates, [correctional] employees, visitors, and the surrounding community." [DX 49B (Fraser Aff. ¶ 16)].

Jail and prison administrators have the legal mandate and professional obligation to ensure that correctional facilities maintain safe environments for those who reside at, work in, or visit them. [Camp Direct ¶ 7]. The presence of contraband in a correctional facility interferes with this mandate because it can allow inmates to disrupt jail operations, escape, or harm themselves or others. [Camp Direct ¶ 8]. It also increases the level of violence at the institution. [Tr. 196–97 (DeRosa Testimony); Tr. 395 (Fraser Testimony)]. At large correctional facilities like OCCF, this dangerous threat places a premium on keeping contraband out, as both the experts and correctional staff agreed that it was extremely hard to find contraband at OCCF once it already had been introduced into the facility. [Tr. 226 (DeRosa Testimony); Camp Direct ¶ 26; Tr. 356–57 (Ryan Testimony)].

For OCCF and other jail facilities, this means that the development of procedures, policies, and precautions that will deter, and hopefully prevent, the introduction of contraband is a priority, because of the dangers that this contraband presents to institutional security, safety, and stability. [Camp Direct ¶¶ 8, 11, 12; Tr. 196–97 (DeRosa Testimony); DX 50A, at 17–18 (DeRosa Dep.)].

The responsibility for stopping the introduction of contraband into OCCF falls on the administrators of that facility. The experts agreed that no prudent correctional administrator could safely rely on security precautions taken by other law enforcement agencies, or even correctional facilities that may have had custody of the inmate before he or she arrived at OCCF. [Tr. 228–29 (DeRosa Testimony)]. The record of this case contains several instances where inmates who arrived at OCCF after spending considerable time in local custody and at arraignment nonetheless possessed dangerous items, such as razor blades, drugs, and bullets. [DX 1B (razor blades); DX 1I (marijuana); DX 1A (bullet)].[7] As former-Commissioner Fraser explained, the police are good at making arrests but often fall short with respect

---

7. Significantly for this case, none of these items was found in or around an arrestee's anal, groinal, or vaginal area—i.e., areas

where only an Admission Strip Search (as I

to thorough and effective searches. [Tr. 385].

The fact that OCCF is a jail, not a prison, does not necessarily make the contraband problem easier to manage. While the Second Circuit surmised in *Shain* that prisons might present more dangerous circumstances because they house inmates convicted of serious crimes, that is only one aspect of the problem. Jails like OCCF primarily house pretrial detainees, some of whom are accused of serious crimes. [Camp Direct ¶¶ 47–50]. Statistics provided by OCCF, and not disputed by plaintiffs, show that one third or more of the persons housed at that facility in every year since 1999 are felony pre-trial detainees, while one-half or fewer of the inmates are either accused or convicted misdemeanants.[8] Moreover, a sample of the inmate population drawn from the month of August in each of the years 2000–2002 reveals that a significant percentage of the post-arraignment pre-trial inmates admitted to OCCF (either the old or the new facility) after being charged with misdemeanors or civil violations had prior felony criminal histories or gang affiliations, which might make them greater security risks than the charges pending against them indicated.[9]

Jail officials rightly view gang affiliation as a serious security risk. During the past two years, OCCF has housed approximately 1,000 gang members from approximately 51 different gangs. [Hefferon Direct ¶ 12]. These have included members of gangs well-known for their violence, including the Bloods, Crips, Latin Kings, Netas, Pagans, BBK (Bankard Barrio Kings), and Ching-a-lings. On any given day there are approximately 50 gang members incarcerated at OCCF. [Hefferon Direct ¶ 13]. In the years 2000, 2001, and 2002, respectively, approximately 42%, 40%, and 50% of those gang members were being held on misdemeanor or lesser charges. Gang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them. [DX 50A, at 117; Hefferon Direct ¶ 15; Tr. 391–92 (Fraser Testimony)]. They are also more likely than other inmates to attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility. [DX 49B, at ¶ 32]. One of the best ways of identifying gang members is by examining markings and tattoos on their bodies. [Hefferon Direct ¶¶ 12–14].

Finally, officials at a county jail like OCCF usually know very little about the new inmates they receive or the security risks they present at the time of their arrival. Ironically, prison officials are often at an advantage here, since sentenced inmates arrive after being convicted and after the preparation of a pre-sentence report (which is theoretically supposed to contain details about the inmate's past).[10]

---

have defined that term above) will uncover contraband.

8. In 1999, 32% of the pre-trial inmates at OCCF were felony detainees and 53% were misdemeanor detainees; 36% were felony detainees and 50% were misdemeanor detainees in 2000; 36% were felony detainees and 49% were misdemeanor detainees in 2001; and 42% were felony detainees and 44% were misdemeanor detainees in 2002. [DX 5, 6, 8, 10].

9. In August of 2000, 33% of the pre-trial inmates admitted to OCCF after arraignment upon being charged with a misdemeanor or civil violation had a felony history and 42% had a gang affiliation; 34% had a felony history and 40% had a gang affiliation in August of 2001; and 26% had a felony history and 50% had a gang affiliation in August of 2002. [DX 7A, 7B, 9A, 9B, 11A, 11B].

10. As a former state court judge who spent three years trying felonies, I am constrained to note that pre-sentence reports in the New

Moreover, many inmates arrive at prisons from jails, where they have been incarcerated and already evaluated for potential security risks (a procedure known as "classification," which will be discussed extensively below).

Both experts and Mr. Fraser agreed that thorough Admission Searches of all arriving inmates are the best way to maintain the security level necessary for keeping serious and dangerous contraband out of OCCF. [Tr. 339–450 (Camp Testimony); Tr. 198, 218–19 (DeRosa Testimony); DX 50A, at 16–18 (DeRosa Dep.); Fraser Direct ¶ 4]. All jail personnel who testified at this trial, including plaintiffs' expert, Robert Joseph DeRosa, testified that, if they could, they would strip search every newly arrived inmate, regardless of what brought him or her to their facility, in order to minimize the risk of introduction of contraband. [Tr. 219 (DeRosa Testimony); Tr. 447 (Camp Testimony); Tr.]. So strongly do the corrections people feel about this that Fraser testified, credibly, that not until the United States Court of Appeals for the Second Circuit denied the motion for rehearing *en banc* in *Shain* did officials at Rikers Island finally stop strip searching every new inmate who arrived at Rikers. [Tr. 393–94 (Fraser Testimony)]. Thereafter, Rikers personnel modified their strip search procedures for certain type of inmates to the extent of acquiring hospital gowns, which allows inmates to remain clothed while they squat and cough—a process that, according to Mr. DeRosa, is generally sufficient to dislodge any contraband contained in the anal or vaginal areas. [Tr. 183].

## B. *OCCF Strip Search Policies*

I find as a matter of fact that until the new jail opened in the summer of 2001, it was the policy at OCCF for each and every newly-arrived inmate to be subjected to an on-arrival strip search, in the manner described above, without regard to the nature of the charges against the inmate or any reason to suspect that he/she might be carrying contraband. Indeed, defendants, through counsel, stipulated that prior to the time when OCCF moved to its present facility the policy was to conduct on-arrival strip searches on every newly-arrived inmate. [Tr. 16]. Moreover, I credit the testimony of Corrections Officers Enos VanAmburgh, James Ognibene III, Christine Mertens (for females), Thomas C. Hefferon, and Robert Crosby on this point. These officers were all assigned during relevant periods to work in the jail's Booking and Receiving area. All of them testified, credibly, that every single new arrival at OCCF was strip searched without regard to the nature of the crime charged, the circumstances of the arrest, or particular characteristics of the arrestee. Their testimony was confirmed by the deposition testimony of defendant Bigger, who was the sheriff of Orange County from 1995 through the end of 2002. [PX 22, at 5–22]. Sheriff Bigger's deposition revealed that new arrivals were strip searched even if they were able to make bail and were not being admitted to the general population. [PX 22, at 20–21].

In or about March 2000, use of the term "personal hygiene check" began at OCCF. I find, based on the credible testimony from Ognibene and the fair inferences drawn from the deposition of Bigger, that a "personal hygiene check" and a "strip search" were *de facto* the same. As Corrections Officer Ognibene testified, "[t]he names changed, but the search remained the same." [Tr. 89].[11] I do not credit the testimony of Capt. Ryan or any other witness who stated that there were differences between the "strip search" and the "hygiene check" as carried out at OCCF.

York State system—at least in New York City—are of wildly varying quality. Some include considerable background information about a newly arrived prisoner; some tell the judge almost nothing.

11. The declaration and testimony of Officer Mertens also support this conclusion. [PX 34; Tr. 145–46].

When OCCF moved to the new jail, new booking and receiving facilities, containing new and improved devices for detecting contraband, were suddenly available. At that point, the County promulgated the "August 2001 Policy." [DX 29]. That policy provided that Admissions Searches "may be conducted" on all inmates charged with felonies, and those inmates charged with misdemeanors or lesser offenses when any of the following factors was present: "(a) Committed sentenced inmate/weekenders; (b) Committed probation/parole violator; (c) Weapons or narcotics offenses; (d) Known gang affiliation; (e) Prior or current escape charges; (f) Committed for a felony; (g) Prior or current contraband charges; (h) Known history of contraband charges; (i) Metal detector/boss chair activation; (j) Inmate that appears under the influence of drugs/alcohol; (j) Currently suicidal inmate; (k) Prior suicidal history in past 10 years." *Id.*[12]

At the preliminary injunction hearing in *Dodge,* both Captain Joseph Ryan, OCCF's Day Shift Commander, and his subordinate Lieutenant Dominic De Marco testified—credibly—that the new policy was implemented to give corrections officers under their command as little discretion as possible about whether or not to conduct strip searches. 209 F.R.D. 65, 73. Thus, while the August 2001 Policy purported (on its face) to list circumstances where an officer "may" conduct a strip search, the policy, in effect, listed the factors that *mandated* a strip search. As a result, at least some strip searches were conducted that violated the reasonable suspicion rule of *Shain.* Indeed, this Court entered a preliminary injunction in *Dodge* after finding that newly arrived inmates were strip searched, pursuant to the August 2001 Policy, without reasonable suspicion to believe that they might be secreting contraband.[13]

The only inmate testimony concerning strip searches during the period when the August 2001 Policy was in effect came from the three inmates who testified during the *Dodge* preliminary injunction hearing. Nonetheless, that strip searches were carried out during that period without reasonable suspicion to believe that the inmate was secreting contraband was confirmed by several corrections officers, who testified (credibly) that the policy of strip searching all or virtually all new arrivals at OCCF did not really change until 2002. [Tr. 519–20 (Officer Jo–Ann Mance); Tr. 545 (Officer Nancy Duryea); Tr. 549–50 (Officer Joseph Alvarado)]. Additionally, I have no basis to reconsider my findings, made in *Dodge,* that Wallace Babcock, who was arrested at the Orange County Courthouse when he went there voluntarily to try to resolve arrearages in child support payments and transported to OCCF, was strip searched without reasonable suspicion to believe that he was carrying contraband. *See* 209 F.R.D. at 70.[14]

After this Court entered the preliminary injunction in *Dodge,* OCCF again revised

---

**12.** The August 2001 Policy included additional circumstances that would warrant a strip search, but they applied outside the context of Admissions Searches—for example, after the violation of particular contact visiting rules.

**13.** In *Dodge,* I found, based on a record that was far more limited than the one currently before me, that each of several factors that automatically led to a strip search under the August 2001 policy—specifically, activation of the metal detectors/BOSS chair (in the cir-

cumstances in which the chair was used at that time, which was prior to the inmate's removing his clothing and donning prison garb), the appearance of intoxication, or arrest for violation of probation—was insufficient, standing alone, to establish the reasonable suspicion necessary to conduct strip search. 209 F.R.D. at 73–77.

**14.** In *Dodge* I was unable to conclude whether Anthony Dodge had or had not been strip searched—the corrections officer who alleg-

its strip search policy. [DX 30]. That new "August 2002 Policy" provides that a strip search "may be conducted" if any one of the following factors exists: "(A) Committed sentenced inmate/weekender; (B) Committed for Felony offense (Sentenced or Unsentenced); [and] (C) Weapons or Narcotics offenses." *Id.* Again, I find that "may" means "must" when used in the August 2002 Policy with respect to those factors.

In addition, the policy provides that a strip search may be conducted when there is "[r]easonable suspicion that a legally committed inmate is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or circumstances of the arrest (if available)." *Id.* The policy explicitly states that the an officer may consider the following characteristics of the arrestee when determining whether reasonable suspicion exists: "(1) Known Gang Member; (b) Prior or Current escape charges; (c) Inmate has prior or current contraband charges; (d) Metal Detector, Boss Chair, Hand held Magnetometer activation ...; (e) Inmate appears to be under the influence of drugs or alcohol; (f) Currently suicidal inmate; (g) Inmate has history of suicidal behavior; (h) Inmate

displays assaultive behavior; [and] (i) Inmates disposition (nervous, fidgety, sweating, uncooperative, distracting)." *Id.* The policy further provides that an officer who develops reasonable suspicion that an unsentenced misdemeanor or violation arrestee is concealing contraband must obtain approval from a supervisor before performing a strip search. *Id.* By its terms, the August 2002 Policy does not require supervisory approval before strip searching sentenced inmates or those accused of felonies or weapons or narcotics offenses.

### C.  OCCF Procedures

#### 1.  Admitting

The process of admitting a newly arrived inmate takes place in an area of the facility known as Booking and Receiving. (A diagram of the Booking and Receiving Area is attached to this opinion as Ex. 2). Having toured this area, I find that it is a large—indeed, huge—open hall with a booking desk in the center. It is ringed with five separate holding cells, each of which can house multiple inmates.

The following constitutes my findings of fact concerning the procedures followed to admit new arrivals to OCCF since of August of 2002, after the short-lived preliminary injunction was entered in *Dodge.*[15]

---

edly conducted the search denied it and it seemed quite possible that Mr. Dodge was confusing his January 29, 2002 arrest with one of the many previous times when he was strip searched under the blanket policy. Nothing in the present record adds to my ability to make that determination. In order to recover for this particular incident during the damages phase of this case, Mr. Dodge will have to prove to the satisfaction of a jury that he was in fact strip searched in connection with this arrest.

As for Gordon Barnum, the third inmate whose strip search during the August 2001–2002 period was addressed in *Dodge:* Barnum was arrested for petit larceny. He was a frequent visitor to OCCF, and he had a history of using drugs and stealing to support his

drug habit. He even stole drugs—the arrest in question occurred when he attempted to steal Tylenol from a convenience store. Barnum appeared to be under the influence of something when he arrived at OCCF and he told the booking officer that he had taken crack cocaine within the previous twenty four hours. For reasons to be discussed below, I conclude that the officers had reasonable suspicion to conduct a strip search of Barnum—an issue I did not need to reach in *Dodge.* *See* 209 F.R.D. at 77.

**15.**  The injunction was entered on July 26, 2002, and defendants implemented their new policy soon after in August of 2002. As will be noted below, this intake procedure differed in at least one significant particular from the

Inmates arrive at OCCF in shackles and restraints and are discharged at a sally-port outside the Booking and Receiving area. Usually, staff at OCCF are alerted that a vehicle transporting inmates will be arriving so they are prepared to process the inmates when they arrive. [Tr. 423–25 (Camp Testimony)]. The inmates typically are met by two OCCF Booking and Receiving officers, who review the inmates' securing orders to make sure that OCCF is authorized to receive them. If this paperwork is satisfactory, the OCCF officers escort them inside OCCF into the Booking and Receiving area. [Tr. 424; Camp Direct ¶¶ 3–10].

Inside the OCCF Booking and Receiving area, the officer lines the arriving inmates up against an interior wall, asks them if they have anything in their pockets (such as drugs, weapons, or needles), and then conducts a pat-search. Any items taken from the inmate are placed in a plastic bag. [Tr. 424; Camp Direct ¶¶ 19–25]. At that point, the inmate is issued an institutional jump suit and is taken to a semi-private "changing room." It is at this point that an inmate who is going to be strip searched is strip searched.

As described above, the August 2002 policy provides that the following categories of inmates are automatically subjected to strip searches upon their arrival to OCCF: (1) all sentenced inmates, (2) all inmates who have been committed to OCCF for a felony offense (whether or not they have been sentenced, or even tried), (3) all inmates charged with drug or weapons offenses, and (4) all inmates who are returning from court or work details (regardless of the nature of the charges lodged against them). [DX 30]. If a corrections officer concludes that an inmate falls into one of these categories and con-

ducts a strip search, he must note that fact on a form called an "Admissions Strip Search Report." [DX 20L].

If the new arrival is charged with a misdemeanor or violation or is civilly committed, and the offense does not involve drugs or weapons, the written policy states that the corrections officer on duty must assess the inmate's individual circumstances to determine whether there is reasonable suspicion to conduct an Admission Search. [DX 30; DX 20L]. If a booking and receiving officer believes that such reasonable suspicion exists, the officer first must then secure the approval of a supervisor before a strip search can be performed. [Tr. 280 (Ryan Testimony); DX 20L]. If the supervisor approves, then both the officer and the supervisor must execute an Admission Strip Search Report, and the supervisor also must describe on that form the "reasonable suspicion" that provided the basis for the search. [DX 20L].[16]

Any strip search is conducted by an OCCF officer of the same sex in a semi-private changing room that has opaque glass on a portion of the window in the door. This prevents other inmates or staff from observing what is happening. [Tr. 425, 481–82 (Camp Testimony); Camp Direct ¶ 35]. The officer never touches the inmate during a strip search, which is carried out in the manner described above. As soon as the search is concluded, the inmate puts on the institutional jumpsuit. The balance of his or her belongings is placed in a plastic bag for deposit with the OCCF property clerk. [Tr. 425].

There is no evidence in this record that any inmate has complained of being physically or sexually abused by OCCF staff

procedure that was followed from August 2001 until August 2002.

**16.** See below for specific findings of fact concerning OCCF's compliance or non-compliance with this policy in particular cases.

during an Admission Search, that any inmate has filed an internal grievance alleging such abuses, or that any such abuses have occurred.

Once the inmate has changed into the institutional jumpsuit, he or she then is walked through the metal detector and required to sit in the Body Orifice Security Scanner ("BOSS") chair. The BOSS chair is a non-intrusive, high sensitivity detector designed to detect metal objects hidden in body cavities. It is used to screen inmates for weapons and contraband objects that might be hidden in anal, oral, vaginal, and nasal cavities. [DX 20M]. It will not pick up non-metallic items such as drugs, cigarettes, or money. The BOSS Chair is not foolproof, but it enhances any other search conducted on an arriving inmate. [Tr. 246–47 (DeRosa Testimony)].

The BOSS scan comes after most inmates who are going to be strip searched have already been strip searched. [Tr. 425 (Camp Testimony)].[17] Though nothing in the record indicates as much, I presume that if an inmate who was not previously subjected to a strip search sets off the BOSS chair, he or she is returned to the changing area and strip searched under the "reasonable suspicion" standard.

After clearing the BOSS Chair, the inmate is placed in one of the OCCF's holding cells, usually directly opposite the booking area so inmates can be observed by corrections officers. [Tr. 425; Camp Direct ¶¶ 9–17]. Later, the inmate is interviewed by an OCCF booking officer to obtain the pedigree information necessary to complete various forms and the answers to suicide screening questions. [Tr. 425; Camp Direct ¶¶ 1–6; DX 20–20–L, 20N–20O]. All the pertinent information about the new inmates in these forms is self-reported. [Tr. 289 (Ryan Testimony)].

After the inmate's paperwork has been completed, he is fingerprinted and, if he is charged with a crime (either felony or misdemeanor), his fingerprints are forwarded to the New York State Department of Criminal Justice Services ("NYSDCJS") to confirm his true identity. Under New York law, OCCF is not permitted to forward to NYSDCJS the fingerprints of persons remanded for civil violations, persons remanded for family court non-payments, or immigration detainees. OCCF must destroy these fingerprints when the inmate is discharged. [Tr. 281 (Ryan Testimony)].

Finally, the inmate receives a medical assessment by one of the OCCF nurses. Once all the paperwork and assessments required during the booking and receiving

---

17. This is a significant difference from the policy that was described to me at the preliminary injunction hearing. There, Lt DeMarco, the Records Supervisor at OCCF, testified that the inmates were put through the BOSS chair before being ordered to remove their own clothing and change into prison garb. Lt DeMarco also testified that no inmate was ever strip searched under the August 2001 policy before being placed in the metal detector/BOSS chair. *Dodge*, 209 F.R.D. at 68. The arriving inmates were asked to remove anything that might set off a metal detector before being put through the machines, but of course items like jewelry, belts, shoe lasts and jeans studs could well have set off the detectors as the BOSS chair was originally used.

Lt. DeMarco's testimony was confirmed by Capt. Ryan and Corrections Officers Fagan and Essig. *Id.*

Issuing prison garb before putting someone through the metal detector/BOSS chair no doubt cuts down on the false positives that were the subject of much testimony and discussion in *Dodge*. Statistics introduced at the preliminary injunction hearing demonstrated that 60% of the strip searches that were conducted between August 1, 2001 and February 14, 2002 were triggered by the inmate's setting off the metal detector/BOSS chair. Unfortunately, no one explained why strip searches for reasons other than setting off the BOSS chair were moved to an earlier point in the booking and receiving process.

process are completed, the inmate is escorted to a new housing unit, where he or she will remain pending completion of the classification and assessment process. [Hefferon Direct ¶ 6]. Inmates are housed as follows: Alpha 1 houses adult and juvenile men without acute medical problems or a history of prior suicide attempt or current suicidal ideation; Bravo 4 houses suicidal males, adult and juvenile; Bravo 1 houses all newly-arrived females, adult and juvenile, regardless of suicidal ideation; Medical 1 houses adult and juvenile males with acute medical (non-psychiatric) problems; and Medical 2 houses adult and juvenile females with acute medical (non-psychiatric) problems. OCCF believes that there is no need for a more elaborate housing assignment at the pre-classification stage because the new arrivals—regardless of the nature or severity of the charges pending against them—are kept confined to their cells for twenty three hours a day until the classification process is complete.[18] They leave their cells only for one hour of daily recreation, a fifteen-minute shower, and necessary medical or legal visits. [Ryan Direct ¶ 19; July 25, 2003 Letter to the Court]. Meals are taken in the cells.[19] As a result, newly-arrived and pre-classified inmates do not have the same opportunity that classified inmates do to intermingle with others in the housing unit—or, presumably, to pass contraband from one to another.

### 2. *Classification*

Under New York law, *see* N.Y. Correct. Law § 500–b (McKinney 2003), OCCF is required to classify inmates for housing assignments and supervision levels according to the risks that they present. [Ryan Direct ¶ 21].

The classification process at OCCF begins shortly after the new inmate arrives. [Hefferon Direct ¶ 5]. The paperwork completed in Booking and Receiving is forwarded to the Classification Department so that it can start to assemble the information necessary to classify the inmate in accordance with New York law. *Id.* at ¶ 6. Classification requires an assessment of the inmate's criminal history, current charge(s), pending detainers, current or prior disciplinary problems at OCCF or any other correctional institution, problems adjusting to confinement, amount of bail, propensity for victimization, escape or contraband risk, aggressive behavior, history of bail jumping, or any other factor that may be required to properly evaluate the danger a particular inmate presents. [DX 40B–2, at 17 (Ryan Dep.) ].

Classification officers record their overall assessment on a worksheet to develop the security score that defines the inmate's classification level: minimum custody, low medium custody, high medium custody, or maximum custody. [DX 40B–2, at 17 (Ryan Dep.); Ognibene Direct ¶ 6; Van Amburgh Direct ¶ 6]. This custody level is used to ensure that the inmate only receives housing and work assignments that are compatible with the security risk that he or she presents. [Tr. 93 (Ryan Testimony) ].

Under New York law, the classification officers at OCCF have seven days to complete the classification of new inmates. [Hefferon Direct ¶ 10]. The testimony at trial indicated that the classification process at OCCF usually was completed within three to five days. [Ryan Direct ¶ 21].

OCCF obtains criminal history information about newly arrived inmates during

---

**18.** After classification, twenty-three hour a day confinement would be considered punitive in nature.

**19.** This is true at the post-classification stage as well.

the classification process. Criminal history is derived from so-called "File 15" reports, also known as "rap sheets." To obtain these reports, OCCF (or any other law enforcement facility) must have access to a NYSPIN terminal. At OCCF, the NYSPIN terminal is located in a secure room within the Classification Department, which is about 600 feet away from the Booking and Receiving area. Captain Ryan testified that the County has placed the NYSPIN terminal in the Classifications Department to control access to and the use of the rap sheets that are generated. According to Captain Ryan, this is necessary due to New York State rules restricting dissemination of the File 15 reports because of privacy and confidentiality requirements. [Ryan Direct ¶ 15].[20]

Criminal history information about an arriving inmate, in the form of a File 15, can be (and generally is) obtained expeditiously. Former Corrections Officer Enos Van Amburgh worked for approximately eight and a half years in the jail's Classification Department. It was his job to run rap sheets on every inmate processed at the Orange County Jail (the old facility). Van Amburgh did so as soon as he received the paperwork from booking. [Tr. 12]. Customarily it took him only a couple of minutes to generate a File 15 on an inmate. *Id.* Although, in Van Amburgh's experience, there were occasions where attempts to secure a File 15 were delayed, this did not happen often. [Tr. 13]. In the eight and a half years that Van Amburgh worked in classification, the terminal probably went down only "five times, six times," [Tr. 15], and when the terminal was down, it could be back up in five minutes. While it has happened that the terminal was down for up to three or four hours, [Tr. 13–14], I conclude, based on

Van Amberg's testimony, that this happened no more than five times during an eight and a half year time span. The terminal was never down for as many as eight hours when Van Amburgh was there. [Tr. 14].

Capt. Ryan acknowledged that the time from when the NYSPIN terminal receives the inmate's name and social security number to when it provides the File 15 could be as quick as the time it takes to log onto a website. [Tr. 95]. All that is needed to generate a File 15 is the inmate's name, social security number, and date of birth. [Tr. 320]. He also conceded that the terminal operates under normal conditions most of the time. [Tr. 95]. Capt. Ryan testified that the system is "booted," usually "once or twice a month." *Id.* But there is no evidence in the record tending to show that this adversely affects the turnaround time to generate File 15's or otherwise delays the in-processing of inmates. I recognize that, hypothetically, a computer malfunction could slow the process down considerably. But on the record before me I cannot conclude that this happens with any frequency.

Rap sheets are generated based on self-reported information, and not until fingerprints have been compared is it possible to confirm that the arrestee is in fact the person he says he is. Fingerprint confirmation normally takes more than a week to get to OCCF. [Ryan Direct ¶ 21]. Of course, some arrestees' identities cannot be confirmed via fingerprint check. If an arrestee has not previously been fingerprinted—for example, if he or she has never before been involved with the criminal justice system—then there is no way for corrections officers to obtain absolute identity confirmation. Nonetheless, cor-

---

20. Though Captain Ryan did not so specify, I assume that he was referring to the regulations concerning NYSPIN security set forth at

N.Y. Comp.Codes R. & Revs. tit. 9, § 486.4 (2003).

rections officers evaluate those inmates and make risk assessments about them, based on self-reported information.

I conclude that corrections officers do rely on self-reported information in making classifications and risk assessments. Moreover, in the absence of data indicating that significant numbers of new arrivals at OCCF turn out to be lying about who they are—and there is no hard data on that issue in this record—I conclude that File 15s generated on the basis of self-reported data are generally reliable. Lacking any evidence of how frequently new arrivals at OCCF attempt to mask their identity, I cannot and do not conclude that rap sheets are *per se* unreliable or could not be used by corrections officers as one piece of information in making preliminary assessments during the booking and receiving process.[21]

Nothing prevents the operator of the NYSPIN terminal from sharing with officers in Booking and Receiving information in a new arrival's File 15 criminal history during the booking and receiving process. As Capt. Ryan put it, "There's no reason why anybody can't communicate any information to anybody." [Tr. 97]. However, booking officers at OCCF do not receive criminal history information from Classification Officers during in-processing of new arrivals.

In addition, Orange County maintains computerized "prior commitment" records that contain information about persons formerly admitted to the facility. These records are generated and maintained by the County as a part of their classification process. [PX 40].

Upon completion of the classification process, the inmate is assigned to a more permanent housing unit, where he or she dwells with other inmates who are similarly classified in terms of their security risk and who are not considered a threat to the new inmate. [Ryan Direct ¶ 21]. A typical housing unit, therefore, may contain inmates charged with misdemeanors and/or felonies, inmates remanded under civil commitments, and immigration detainees, as long as all of these inmates pose approximately the same security risk. *Id.*

3. *Information Available (or Not Available) at the Time of the Booking and Receiving Process*

As noted above, a new arrival at OCCF brings with him a securing order from the court that arraigned him and committed him to OCCF's custody. This order contains minimal information about the inmate, typically consisting of only the name the arrested individual gave to the arresting agency, the charge pending against him, and information concerning bail (e.g.,

---

**21.** I must observe that the judges and magistrates who sit in arraignment parts and make bail decisions at arraignment hearings do not have the luxury of waiting several days for fingerprint confirmation to come in, and thus rely heavily on these very File 15 "rap sheets" to make decisions that affect the safety of the community. While I recognize that people do on occasion use aliases to try to mask their identity, I also recognize that NYSPIN rap sheets provide helpful information—sometimes the most helpful information—when time is of the essence (for example, to satisfy constitutional arrest-to-arraignment standards). Indeed, OCCF corrections officers make preliminary risk assessments about new prisoners in order to assign them appropriately within the pre-classification housing bloc—according to defendants, OCCF personnel assess each new arrival for identified direct contact problems (i.e., should the inmate by kept apart from some other particular inmate), propensity for victimization, and risk of escape. Thus, it is simply silly for defendants to suggest that rap sheets are of no value whatever until fingerprint confirmation comes in.

the amount bail was set for). [DX 18]. Thus, securing orders generally do not contain detailed information relevant to an assessment of whether there is reasonable suspicion to believe that a new arrival at OCCF might be secreting contraband, except for the crime charged. [Tr. 236 (DeRosa Testimony) ].

Booking and receiving officers at OCCF, who are charged with in-processing new arrivals and making decisions about matters like whom to strip search, receive no information other than the securing order that arrives with the prisoner. They are not provided with the File 15 "rap sheet" generated by OCCF's Classification Department. They are not even provided with information about whether the new arrival had previously been incarcerated at OCCF, although that information is maintained at the jail.

Captain Ryan's testimony concerning why information generated within OCCF itself is not provided to officers in Booking and Receiving makes no sense. He testified that rap sheets are not made available to booking officers because the information contained therein is "privileged" (though he did not explain the nature of the privilege), and he indicated that it was undesirable for such information to be disseminated to staff members, lest they take a dislike to a particular prisoner, which he deemed not "beneficial to good operations." [Tr. 96–97]. He did not explain why this particular concern overrode giving Booking and Receiving personnel information that would help them do their job of evaluating arriving inmates for reasonable suspicion of contraband, or how it was that the use of this "privileged" information by the officers who work in Classi-

fications did not give rise to the same concerns.[22]

There is also information elsewhere in the system that might be made available to the booking and receiving officers who are in-processing new arrestees. For example, every arresting officer on a police force in the State of New York is required to prepare a police arrest report, containing information about the circumstances of the arrest and information about a suspect. [Tr. 152]. These reports are not confidential [Tr. 153], and nothing in the law would prevent a police agency from giving a copy of an arrest report to whoever is transporting a detainee to OCCF or from faxing the arrest report to jail.

The City of Middletown is one of the largest jurisdictions within Orange County. According to its former police chief, Louis Ogden, officers of the Middletown Police Department routinely tell sheriff's deputies who arrive to transport newly arraigned arrestees to OCCF about anything that the deputies ought to know concerning the individuals they are transporting, including information about the perceived dangerousness of the detainee.

Plaintiffs' expert witness, Robert DeRosa, testified credibly that when a new inmate arrived at Rikers Island, in New York City, where he served as deputy warden and warden of the Anna M. Kross Center for approximately seven years, the inmate brought with him a File 15 rap sheet generated at Central Booking, as well as a securing order and arrest ticket (a form containing pedigree information and fingerprints). [Tr. 239–43 (DeRosa Testimony) ]. The rap sheet was generated by classifications officers within New York City Corrections. *Id.* at 241. Of course, the situation at Rikers differs from

---

22. Presumably, the concern is that the Booking and Receiving officers would tell other corrections officers "privileged" information about arriving prisoners. Of course, officers working in Classifications, who have access to this "privileged" information, could do exactly the same thing.

the situation at OCCF in two rather obvious particulars. First, Rikers is a much larger and busier institution. Furthermore, it receives all its prisoners from a single police department, not from thirty seven different jurisdictions. However, that police department—the NYPD—is a gigantic decentralized police department, with thousands of officers scattered over five separate counties, each of which is significantly larger than Orange County in terms of population.

Personnel who transport prisoners from the various municipalities to OCCF and OCCF Corrections Officers are not trained in how to gather information from other law enforcement agencies within Orange County. [Tr. 319 (Ryan Testimony)].

At no time have OCCF officials asked the various municipalities that feed inmates into the jail to devise a system for sharing information about new arrestees that could be used to make the kind of individualized assessment about the risk of contraband carriage that is required by existing Second Circuit case law. *Id.* at 317–18. Therefore, no one knows whether it is possible to devise a workable information sharing system with the multiple jurisdictions involved. Captain Ryan thinks it would be "pretty much impossible," [Tr. 277], while Chief Ogden believes that if the County simply directed local law enforcement to provide it with information, the authorities would readily comply. Chief Ogden testified credibly that, while he was Chief, he would have told his officers to provide sheriff's deputies with File 15s and arrest reports if asked to do so. [Tr. 166–67].

The experience of New York City strongly suggests that it would be possible to devise procedures that would require local law enforcement agencies to transmit material in addition to the securing order with a prisoner who was being sent to OCCF. Moreover, contrary to the testimony of OCCF officials, New York State regulations regarding NYSPIN security do not appear to bar the sharing of File 15s among law enforcement agencies. *See* N.Y. Comp.Codes R. & Revs. tit. 9, § 486.4 (2003).

### 4. *Compliance (or Non–Compliance) with the August 2002 Strip Search Policy*

On July 26, 2002, this Court entered a preliminary injunction in the *Dodge* case, in which I directed that OCCF comply with the mandate of the United States Court of Appeals for the Second Circuit as handed down in *Shain.* I thus enjoined the defendants in *Dodge* to conduct strip searches of newly-arrived inmates only when they had reason to believe the new arrival might be secreting contraband, based on (1) the nature of the crime charged; (2) the circumstances of the arrest; and (3) the particular characteristics of the arrestee. [DX 33]. The injunction did not direct OCCF personnel to adopt any particular policies or procedures in order to effect this result, leaving all such matters to the sound discretion of experts in penology. The court simply and solely directed defendants to comply with the Constitution as interpreted by the Second Circuit in *Shain.*

The *Dodge* injunction expired ninety days later, pursuant to the Prison Litigation Reform Act ("PLRA"). *See* 18 U.S.C. § 3626(a)(2) ("Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90–day period.").[23]

---

23. The reason for this incomprehensible development is that neither side in *Dodge* so much as mentioned the PLRA until after the preliminary injunction expired. Apparently,

Shortly after the *Dodge* injunction was entered, OCCF adopted the August 2002 strip search policy. OCCF contends that it voluntarily continues to follow this policy, even though the *Dodge* injunction has expired. Plaintiffs contend that this is a paper policy only, and that it is routinely disregarded. Defendants demur.

At trial, plaintiffs presented testimony from ten witnesses, all of whom were arrested after the August 2002 policy went into effect, and all of whom insisted that they had been strip searched upon their initial arrival at OCCF, despite the fact that they were arrested for misdemeanors or civil violations and that officers had no probable cause to believe that they were carrying contraband. Defendants presented testimony from the corrections officers who in-processed these individuals. What follows are my findings of fact concerning these incidents. Because the individuals whose stories are told below are all members of the plaintiff class, and both sides have requested a jury trial on the subject of damages, these findings of fact pertain solely to the injunctive phase of the case.

### a. *Gary Luke*

Gary Luke was admitted to the Orange County Jail on or about October 5, 2002, on a bench warrant arising out of a violation of probation and a charge of injuring an animal (a Class "A" Misdemeanor).

Upon his arrival at the receiving area, he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. The record does not indicate the nature of the underlying charge or the nature of the violation, but Luke testified without contradiction that it had nothing to do with either drugs or weapons. [PX 4; Tr. 19; DX 68]. Luke was admitted to the general population.

There is no dispute that Luke was strip searched on arrival at OCCF; the appropriate paperwork so indicates. [DX 68]. The corrections officer who supervised Luke's admission to the jail was David Myers. Myers had no recollection of Luke's arrival independent of his paperwork, although he knew Luke from prior incarcerations at OCCF.[24] However, the Strip Search Report that is part of Luke's file indicates that Luke appeared to be under the influence of "drugs or alcohol" when he arrived at the jail. He had eleven pull tabs on his person, and during questioning Luke admitted to having a prior problem with alcohol. Based on his appearance and property inventory, Luke obtained supervisor consent to conduct a strip search and prepared the appropriate paperwork, with supervisory sign-off as required by the policy.

neither plaintiffs' counsel nor the County's attorney was aware that, pursuant to the PLRA, preliminary injunctive relief expires unless the court makes the order final, consistent with § 3626(a)(1) (which requires a court to make findings as to whether prospective relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right), within ninety days after the entry of the preliminary injunction. Plaintiffs made no effort to have this Court timely make the findings necessary to permit continuance of the injunction.

After the decision in *Dodge* came out, Orange County hired as outside counsel the law firm of Epstein, Becker & Green, which has handled considerable PLRA litigation. Since Epstein Becker's entrance into the case, the PLRA and its requirements have been the focus of substantial litigation, and this trial was conducted with those requirements very much in mind.

**24.** Luke was a frequent visitor to OCCF, having been arrested and strip searched on two prior occasions pursuant to the blanket strip search policy. [Plaintiff's Proposed Finding of Fact 2–13].

I find that Officer Myers did not have reasonable suspicion to conclude that Luke might be secreting contraband on his person, so as to justify an on-arrival strip search. Myers had no suspicion whatever that Luke was under the influence of drugs. Eleven pop top cans does indeed suggest the influence of alcohol, but Luke appeared to be drunk, nothing more. There is no evidence in this record that alcohol abuse is correlated with efforts to introduce into the facility contraband of the sort that can be hidden in the anus or genitalia. *See Dodge*, 209 F.R.D. at 76–77, and cases cited. Moreover, alcohol intoxication is not a *per se* reason to conduct a strip search; it is merely a factor that an officer can consider. In Luke's case, the evidence suggests that the officer searched Luke simply and solely because he believed that the jail's policy allowed him to search any newly arrived inmates who appeared to by drunk. [Myers Direct ¶ 8].[25]

b. *John MacChurch*

John MacChurch was admitted to the Orange County Jail on February 27, 2003 for failure to pay child support. Upon his arrival at the receiving area he claims he was brought to a separate room where he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. None of the circumstances surrounding MacChurch's arrest involved the use or possession of drugs or weapons. [PX 49; Tr. 25].

Defendants contend that MacChurch was strip searched during a cell shakedown, not during MacChurch's admission to OCCF. [Tr. 29–30]. The "no search" box on MacChurch's Admissions Strip Search Report was checked off, [PX 60A], but no corrections officer testified about

the MacChurch search or about his admission to OCCF.

After hearing MacChurch testify, I find him to be a credible witness and conclude he was strip searched without reasonable suspicion in violation of OCCF's stated policy.

c. *Demorris Reed*

Demorris Reed was admitted to the Orange County Jail in February 2003 for failure to pay child support (Family Article 4). His arrest did not involve the use or possession of drugs or weapons. [PX 46; Tr. 32]. Nonetheless, he claims that, upon his arrival at the receiving area, he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. Reed was admitted to the general population.

Corrections Officer William Proscia received Reed at OCCF. Proscia testified that he was going to strip search him because high bail ($7,000) had been set for the prisoner, which caused Proscia to wonder if he might have been charged with a felony. [Tr. 537]. However, he stated that a supervisor overruled him, and so he did not conduct the search. I do not credit this testimony, largely because Officer Proscia testified that the strip search policy at OCCF in 1999 and 2000 was otherwise than I have found it to be. [Tr. 533–34]. I find that Reed was in fact strip searched upon arrival at OCCF, without reasonable suspicion and in violation of jail policy.

Reed was again admitted on April 9, 2003 for endangering the welfare of a child (a Class "A" Misdemeanor). He claims that he was subjected to a strip search at the jail in the same manner as before.

---

**25.** Officer William Proscia also appears to share this misapprehension. [Tr. 534].

Reed testified that the notation in the Admission Strip Search Report, [DX 61B, 61C], which indicates that he was not strip searched, is "wrong." [Tr. 38–39].

This time, Reed's admitting officer was Joseph Alvarado. Alvarado has no recollection of admitting him, and testified only to the procedure that he should have followed, since he checked the "no search" box on the Admissions Strip Search Report. Since Alvarado is not able to controvert Reed's testimony, I accept it as true.

There were violations of OCCF's strip search policy in Reed's case.

### d.  *Delacy Brandon–Abraham*

Delacy Brandon–Abraham was admitted to the Orange County Jail in February 2003 for violation of an Order of Protection (Family Article 4). She claims that, upon her arrival and before being placed in a cell, a female corrections officer escorted her to a room and ordered her to remove all of her clothes; squat down; and expose her breasts, female genitalia, and anal cavity for visual inspection. None of the circumstances surrounding the arrest involved the use or possession of drugs, weapons, or contraband. [PX 47; Tr. 40]. Brandon–Abraham testified that the notation in the Admission Strip Search Report indicating that she was not strip searched, [DX 53A], is not correct. [Tr. 45–46]. Brandon–Abraham was admitted to the general population.

Corrections Officer Jo–Ann Mance–Saenz in-processed Brandon–Abraham, whom she recalls as a "large woman" who "arrived at the OCCF with a substantial amount of candy." [Mance–Saenz Direct ¶ 7]. After pat-searching Brandon–Abraham, she took her into a changing room, with a jump suit. Per standard procedure, she asked Brandon–Abraham to remove all of her clothing other than her undergarments, so she could do a routine check for contraband under the armpits, between

the toes, and in the hair. Apparently, Brandon–Abraham was not wearing any undergarments—a fact that Officer Mance–Saenz learned only when the inmate removed her outer clothing. Officer Mance–Saenz told her to put on a jump suit and went in search of some underwear that would fit her. Since this was not an Admissions "strip search" as defined above, Officer Mance–Saenz filled out the paperwork accordingly.

I credit the testimony of Officer Mance–Saenz. There was no violation of OCCF strip search policy in Brandon–Abraham's case.

### e.  *Jeremiah Westford*

Jeremiah Westford (18 years old), Charles Toto (19 years old), and John Watson (17 years old) were admitted to OCCF in April 2003. Westford was admitted on charges of criminal possession of stolen property (a Class "A" Misdemeanor) and consumption of alcohol in a motor vehicle. Watson was charged with criminal possession of stolen property and petit larceny (both Class "A" Misdemeanors). Toto was charged with criminal possession of stolen property (a class "A" misdemeanor). Each testified that, upon his arrival at the receiving area, he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. None of the circumstances surrounding their arrest involved the use or possession of drugs or weapons. [PX 48; Tr. 174–75]. All testified that the notation in their Admissions Strip Search Report indicating that they were not strip searched was "a false statement," *id.* at 176–77, or "absolutely false," *id.* at 179, or "wrong." *Id.* at 55–56. All three were bailed out of jail within hours of their arrival and before they were introduced into the general population.

A single corrections officers, Michael Pfleger, in-processed these three young men. Pfleger testified that upon their arrival he patted them (and a fourth companion) down, directed them to line up against the wall, and led them, one at a time, to a changing room, where he gave them a plastic bag for their clothes and jump suits into which they had to change. Pfleger remained at the door of the changing room, looking outside to keep an eye on the other three while one young man changed his clothes in the room. While I find that the young men had to remove their clothes (i.e., "strip") in the presence of Officer Pfleger, I credit Pfleger's testimony and do not believe that they were "strip searched" as that term is used in this case.

### f. *Patrick Crowe*

Patrick Crowe was admitted to the Orange County Jail on August 8, 2002 on a charge of petit larceny (a Class "A" Misdemeanor). He claims that upon his arrival at the receiving area he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. Crowe testified that the notation in the Admission Strip Search Report that indicates that he was not strip searched, [DX 52A], is "wrong." [Tr. 68, 70]. Crowe was admitted to the general population.

Corrections Officer William Proscia in-processed Crowe on August 8, 2002. He specifically recalls Crowe because Crowe was crying during the booking process and was placed on close watch as a potential suicide. (Crowe's step-sister had died the previous day.) Proscia claims that he did not strip search Crowe, and that the contemporaneous paperwork confirms this.

I conclude that Proscia did strip search Crowe. Moreover, he violated OCCF's newly-promulgated policy by not obtaining permission from a supervisor prior to conducting the strip search. Under OCCF's August 2002 policy, suicidal ideation upon entry is a factor that an officer may consider in determining whether there is reasonable cause to believe that the new arrival is secreting contraband. But no single factor is determinative under that policy (unlike the August 2001 Policy, where the presence of any single factor automatically led to a strip search), and Proscia did not testify that he had reason to believe that Crowe was secreting contraband on his person. He conducted the strip search simply and solely because it appeared to him that the inmate was suicidal. There is no evidence in the record from which I can conclude that suicidal ideation upon arrival correlates with likelihood of carriage of contraband.

That said, I note that the August 2002 policy was instituted only two days prior to Crowe's arrival at the jail. Under the August 2001 policy, suicidal ideation meant an automatic strip search, with no need to obtain supervisory approval. I can well imagine how confusing the whole situation was for corrections officers, who theretofore had been given—by design—little or no discretion in determining whether or not to strip search an inmate. And inmate suicide presents corrections officers with a nightmare scenario. So Proscia's decision to strip search Crowe was likely an innocent mistake. Nonetheless, this strip search contravened both policy and the reasonable suspicion standard.

Crowe was again admitted to OCCF on August 22, 2002. At that time, he was asked by a corrections officer to remove all of his clothing prior to receiving a jump suit to change into. [PX 42; Tr. 57]. Crowe was admitted to the general population.

This time the admitting officer was Corrections Officer Joseph Alvarado. Alvarado has no specific recollection of admitting Crowe independent of the paperwork, which indicates that no strip search was performed. However, accepting Crowe's unrebutted testimony as true, no "strip search" as that term is defined by OCCF (and this opinion), was performed on that day, although Crowe was required to "strip."

### g. *Christina Fabbro*

Christina Fabbro was admitted to the Orange County Jail in March 2003 for issuing a bad check (a Class "B" Misdemeanor). She claims that, upon her arrival and before being placed in a cell, a female corrections officer escorted her to a room and ordered her to remove all of her clothes; squat down; and expose her breasts, genitalia, and anal cavity for visual inspection. During this time Fabbro was menstruating and, once she was completely naked, she was provided with a sanitary napkin. None of the circumstances surrounding this arrest involved the use or possession of drugs, weapons, or contraband. [PX 45; Tr. 167–68]. Fabbro testified that the notation in the Admission Strip Search Report that indicates that she was not strip searched, [DX 56A], is "not true, because we were strip searched." [Tr. 173–74].

Corrections Officer Nancy Duryea was called out of other duty to in-process Ms. Fabbro on the night of March 27, 2003. She testified, credibly, that she did not strip search Ms. Fabbro that night (see Admissions Strip Search Report dated 3/27/03, part of DX 56G), but did strip search her following a court visit on April 10, 2003. [DX 65, at ¶¶ 9–10]. Ms. Fabbro was also strip searched following a court visit on April 16, 2003, by Corrections Officer Davis. [DX 56G]. Ms. Fabbro's use of the word "we" suggests that she is recalling instances when she was strip searched after arriving in the company of other inmates, which is consistent with a return from a court visit.[26]

I find that there was no violation of OCCF policy in Ms. Fabbro's case.

### h. *Klaus Rice*

Klaus Rice was admitted to the Orange County Jail on November 14, 2002 for failure to pay child support. [DX 54E; Tr. 264–65, 268]. Mr. Rice was taken into custody at the Orange County Family Court in Goshen. [Tr. 261]. He claims that upon his arrival at the receiving area he was brought to a separate room where he was ordered by the corrections officers to remove all of his clothes, squat down, lift his genitals, and spread the cheeks of his buttocks for the officers' visual inspection. None of the circumstances surrounding his arrest involved the use or possession of drugs or weapons. [PX 41; Tr. 260]. Rice testified that the Admissions Strip Search Report that indicates he was not strip searched, [DX 54A], is "incorrect." [Tr. 265–266].

Corrections Officer Rick Essig in-processed Mr. Rice. Essig was working as the "court-prep" officer that day, preparing inmates to go to court and processing those who returned. Apparently, Mr. Rice was taken to OCCF with the inmates who were returning from court visits.

Essig has no memory of admitting Rice and testified only to the procedures that he should have followed had he been acting in accordance with OCCF policy. As pre-

---

**26.** I recognize that it is also consistent with her having been transported to OCCF for the first time in the company of other inmates, but the record contains no information about the circumstances in which she was transported to the jail. Moreover, I find Officer Duryea to be a credible witness.

viously noted, it was standard practice for OCCF corrections officers to strip search any inmate who was returning from a court appearance. Since Rice arrived at the jail with inmates who were returning from court, I find is entirely plausible that he was strip searched just as they were. I find that DX 54A, to the extent it indicates otherwise, is in error.

5. *The Impact of the August 2002 Strip Search Policy on the Presence of Contraband at OCCF*

Shortly after this court entered the *Dodge* injunction, stories about the case were published in the Middletown *Times Herald Record,* which is the principal newspaper in Orange County. Defendants contend that, as the word got out that not everyone who arrived at OCCF would be strip searched, massive amounts of additional contraband were introduced into the facility during the booking and receiving process, thereby resulting in a tremendous increase in the number of State Reportable Incidents of contraband.[27] Defendants blame the increase in seizures of contraband within the facility on public disclosure of the Court's injunction, which they believe has led potential occupants of the jail to believe that they will be able to bring in contraband with impunity. Plaintiffs deny that the *Dodge* preliminary injunction has led to any increase in contraband.

After extensive review of the voluminous materials submitted to me on this question, I side with plaintiffs and conclude that, per the credible evidence, there was no change in the number of incidents involving weapons or contraband at OCCF—

at least, no change that can be traced to large amounts of contraband being smuggled into the facility by newly arriving inmates. While I believe that the *Dodge* injunction is "responsible" for the increase in recovery of contraband, it is responsible only in the sense that OCCF officials stepped up their internal surveillance following the issuance of that injunction and altered their policies concerning what they would and would not report to the State. There is no credible evidence in the record indicating that more contraband was smuggled into the facility *during initial entry by persons arrested for misdemeanors and civil violations who were not strip searched* due to lack of reason to believe that they were carrying contraband.

The statistics that follow were compiled by plaintiffs. [PX 11, PX 12, PX 13, PX 14]. The Court re-counted and arrived at substantially the same results; whatever small differences exist between plaintiffs' count and mine can be accounted for by the fact that different people, working independently, did the classifying. While defendants' counsel claimed during colloquy that the defense disputed the accuracy of plaintiffs' statistics [Tr. 144], they offered none of their own to rebut plaintiffs' showing, nor did they explain in what particulars plaintiffs' numbers were not accurate.

In 1999—at a time when every new arrival at OCCF was strip searched, regardless of reasonable suspicion—there were 5,752 inmates admitted. Officers filed 856 officer contraband reports concerning 940 items of contraband. 61 of those items of contraband fell into the category "Drugs, Alcohol, Meds," and 51 items qualified as

**27.** The New York State Commission on Corrections ("NYSCOC") has issued regulations that require correctional facilities to report certain contraband that is found in a facility. [DX 31]. *See* N.Y. Comp.Codes R. & Revs. tit. 9, §§ 7022.1–7022.7 (2003). It is mandatory,

for example, for a correctional facility to report the discovery of any amount of marijuana or alcohol. [DX 31, at 5–6]. When such a report is made, it is called a State Reportable Incident ("S.R.I.").

"Weapons." A total of 17 items of contraband were found in Booking and Receiving.[28] In that year, the jail filed only 5 S.R.I.

In 2000, when strip searches were still mandatory for everyone, 5,578 inmates were admitted to OCCF. Officers filed 410 officer contraband reports covering 464 items of contraband. 62 items of contraband qualifies as "Drugs, Alcohol, Meds," and 51 were "Weapons." A total of 14 items of contraband were found in booking and receiving. OCCF filed only 4 S.R.I. reports that year.

In 2001—a year when strip searching was still the rule rather than the exception, but when the new facility opened—5,599 inmates generated a total of 226 officer contraband reports concerning 262 items of contraband, including 62 items of "Drugs, Alcohol Meds" and 44 "Weapons." A total of 5 items of contraband were found in Booking and Receiving. That year, OCCF filed a mere 2 S.R.I. reports.

From January 2002 through February 2003, there were 5,779 inmates admitted, 205 officer contraband reports and 213 items of contraband seized (35 "Drugs, Alcohol, Meds" and 31 "Weapons"). A total of 20 items of contraband were found in Booking and Receiving. Only 5 S.R.I. reports were filed prior to July 26, 2002, the date the *Dodge* injunction was entered. Over the next five and a half months, however, OCCF filed 34 S.R.I. reports.

As these statistics demonstrate, it is simply not true that there was any dramatic increase—or any increase at all—in the amount of contraband at OCCF or in the amount that was recovered at Booking and Receiving (and thus, hypothetically, could have come from new arrivals) after the *Dodge* injunction was entered. What these statistics show is that there were significantly more incidents involving contraband during the time period when the County was strip searching *everyone*, and that the number of incidents has gone down significantly since the new jail opened and the county's written policy began to reflect the reality of *Shain*. The smallest amount of contraband—either all contraband or dangerous contraband (drugs and weapons)—was recovered during the period when the County changed its written policy in order to comply with *Shain and* increased its shakedown rate by 500% to 600%. Notably, the number of inmates admitted to the jail has remained relatively constant throughout all the years.

Of course, the statistics also show something else. During the automatic strip search years, when the number of incidents of state reportable contraband was relatively high, OCCF filed fewer than 10 S.R.I. reports a year. Only after this Court issued the preliminary injunction in *Dodge*, and the parties began to prepare the injunction phase of this case for trial, did the number of S.R.I. reports increase to something approximating the number of instances in which reportable contraband was seized. The inescapable inference is that OCCF policy regarding what to report and what not to report changed at

**28.** As noted above, items recovered at "Booking and Receiving" are not limited to those recovered from new arrivals—inmates returning from court visits or work details are strip searched in Booking and Receiving as well. Neither side has suggested what proportion of the few items of contraband that were recovered in Booking and Receiving came from newly-admitted inmates and what proportion came from returning inmates, the propriety of whose strip searches has not been called into question. However, items recovered at Booking and Receiving necessarily account for the entire universe of contraband recovered from newly-admitted inmates during Admissions Searches. Therefore, as a matter of logic, no more than 17 items of State reportable contraband were recovered during Admissions Strip Searches during 1999.

about the time OCCF had a motive to argue that reducing on-arrival strip searched led to "a direct, observable negative impact on security at the Facility." [PX 31C, at ¶ 29].

Faced with this clear and compelling inference, Capt. Ryan testified that he had reviewed the internal officer reports and found that all incidents that should have been reported to the State since 1999 were in fact reported to the state.[29] If Capt. Ryan is telling the truth, then out of the 1,879 officer-reported items of contraband from January 1999 through July 26, 2002, only 16 met the state's criteria of a reportable incident. But given that the state's criteria require an S.R.I. report for "any quantity of marijuana," "drugs other than marijuana that would constitute a crime under the Penal Law," and "any quantity of alcohol," [DX 31, at 5–6], the following data demonstrate that Ryan is *not* telling the truth:

1. During calendar year 1999, corrections officers at OCCF prepared 61 officer reports concerning drugs, alcohol, and medication. Of this total, 15 reports concerned the recovery of marijuana; 3 reports were filed concerning heroin; 6 reports were filed concerning cocaine; 3 reports were filed concerning psychotropic medication; and 6 reports were filed concerning alcohol/hooch. All appear to be state reportable. As shown above, only 5 S.R.I. reports concerning contraband were filed during 1999.

2. During calendar year 2000, corrections officers at OCCF prepared 62 officer reports concerning drugs, alcohol, and medication. Of this total, 25 reports concerned the recovery of marijuana; 5 concerned the recovery of cocaine/crack; 4 concerned the recovery of alcohol/hooch; and 1 concerned the recovery of heroin. During the same period, OCCF filed only 4 S.R.I. reports about contraband.

3. During calendar year 2001, OCCF corrections officers prepared 62 officer reports concerning drugs, alcohol, and medication. Of this total, 15 reports concerned the recovery of marijuana; 5 concerned the recovery of cocaine; 1 concerned the recovery of heroin; and 1 concerned the recovery of alcohol/hooch. OCCF filed 2 S.R.I. reports.

4. From January 1 through July 26, 2002, officers prepared 35 officer reports concerning the recovery of drugs, alcohol, and medication. Of this total, 10 reports concerned the recovery of marijuana; 5 concerned the recovery of cocaine; 1 concerned the recovery of hashish; 2 concerned the recovery of paraphernalia (needles); and 1 concerned alcohol/hooch. Only 5 S.R.I. reports were filed in connection with these 18 reportable incidents.

To summarize: In 1999 there were 33 reportable incidents of drugs and alcohol and only 5 S.R.I. reports; in 2000 there were 35 reportable incidents of drugs and alcohol and only 4 S.R.I. reports; in 2001 there were 22 reportable incidents of drugs and alcohol and only 2 S.R.I. reports; and in 2002 there were 18 reportable incidents of drugs and alcohol prior to

---

29. Ryan testified:

> Q My question is: In your review of the records—let's say for the year 1999—did you review those records?
> A I think so, yes.
> Q In your review of the records, did you see whether or not there were any incidents of contraband that were reported by corrections officers internally—that is, within the facility—that were not in turn reported to the state, yet they were reportable incidents?
>
> \* \* \* \* \* \*
>
> A No. Not that I seen, no.
> Q So based on your review, all reportable incidents of contraband were, in fact, reported to the state?
> A As far as I could see, yes. [Tr. 110–11].

July 26 but only 5 S.R.I. reports. And this only counts drug and alcohol incidents. All weapons recoveries are also state reportable as well, and a total of 146 weapons were recovered during the years 1999–2001—years in which 5 or fewer S.R.I. reports were filed.

Capt. Ryan testified at trial that the reason for this rather startling discrepancy was officer error:

> During that time period, I believe we did have some new officers working in classifications. They may not have been up to speed on what they should have been doing. A lot of times reports are interpreted different ways and an officer may not interpret a report as a reportable incident or didn't know and should have reported it.

[Tr. at 325]. Thus, in mid-trial, Ryan did an about-face and suggested that the jail was *underreporting* the number of S.R.I.s during the periods prior to the preliminary injunction. [Tr. 347–48]. He attributed the County's past failure to report S.R.I.s to "probably poor communication, judgment by the command staff on whether it was reportable or not. Receiving a field test, whether it was positive or negative, things like that." [Tr. at 336]. Despite the clear, objective state mandate to report *all* marijuana and illegal drugs, Ryan pitched the idea that there is "a fair amount of senior officers' . . . judgment and discretion that goes on in this state reporting process." [Tr. 337]. This explanation contradicts Capt. Ryan's sworn testimony in PX 31 and his earlier testimony at trial, [Tr. 110–11], in which he stated that every State Reportable Incident was in fact reported.

Moreover, Capt. Ryan acknowledged that at least one of the officers in classifications, Officer Hefferon, has been making determinations as to which incidents are state reportable in all the years from 1999 to the present. According to the Captain, Hefferon did not ever change the criteria

by which he made (and still makes) those determinations. [Tr. at 325–326].

I thus do not credit the explanation advanced at trial for the failure to report dozens of State Reportable Incidents. I do, however, accept the fact that there were dozens of State Reportable Incidents that in fact went unreported by OCCF during the period prior to the issuance of the *Dodge* injunction. The disparity between reported and reportable incidents in those years undermines, rather than supports, the County's claim that the post-injunction spike in S.R.I. reports correlates with a "major increase" in the amount of serious contraband entering the facility.

And lest we forget, the only contraband with which we are concerned here is contraband that would have been uncovered during an on-arrival strip search of a newly arrived inmate—not contraband smuggled in after court visits or contact visits, or contraband supplied to inmates by errant corrections officers (which, unfortunately, has been known to happen [Tr. 350–52] ). It is not possible to infer from the statistics before me that any significant amount of additional contraband was being smuggled in by *newly arrested and arraigned* inmates. Indeed, none of the numbers provided to the Court by the parties suggests how much contraband that was recovered at Booking and Receiving was recovered from *newly arrived inmates* (the only group relevant to this proceeding) and how much came from inmates who were in-processed at Booking and Receiving after returning from court visits or work details outside the facility.

What it is possible to infer from plaintiffs' statistics is that the amount of contraband recovered at Booking and Receiving remained relatively constant over the four years under study:

In 1999, there were 17 instances of contraband recovered at Booking and Receiving.

In 2002, there were 14 instances of contraband recovered at Booking and Receiving.

In 2001, there were 5 instances of contraband recovered at Booking and Receiving.

In 2002, there were 13 instances of contraband recovered at Booking and Receiving.

2001, not 2002 (when there was supposedly a tremendous increase in the amount of contraband being smuggled into the jail), appears to be the atypical year.

Furthermore, if an increase in contraband inside the facility were attributable to changes in the institution's ability to strip search new arrivals, one would expect the amount of contraband recovered at Booking and Receiving to go *down*, not *up*, following the entry of the *Dodge* injunction and the corresponding decrease in on-arrival strip searches. Precisely the opposite occurred—12 of the 13 instances of contraband recovered at Booking and Receiving during 2002 came after the decision in *Dodge* and the change in strip search policy. This suggests that something other than the jail's ability to strip search all newly arrived inmates must be at work here.

The evidence reveals what that something is: In August and September 2002, there was a 500% to 600% increase in the number of shakedowns that were conducted within a couple of weeks after the preliminary injunction was issued. [Tr. 112, 352]. A shakedown is a thorough search of a particular housing unit or an individual cell. [Tr. 111]. A shakedown of a cell consists of looking in every area in which an inmate could hide contraband—under the mattress; in mattress seams; in the toilet bowl; in books, clothing, foot locker, or windowsills; under paper on the walls; "virtually every spot." [Tr. 112]. One of the purposes of a shakedown is to find contraband. [Tr. 112].

The record reveals that the dramatically increased shakedowns after July 26, 2002 achieved its purpose. Relatively speaking, large amounts of contraband were recovered during shakedowns in the last five months of 2002, almost all of it from dorms and cells. [PX 11(D), 12(D) ].

However, there is also nothing in the record to correlate the contraband found with contraband that was smuggled into the facility by new arrivals who were arrested for minor crimes and civil violations. Indeed, the Court's own recount of officer reports filed after July 26, 2002—the date of the *Dodge* injunction—reveals that well over half of the items of reported contraband recovered during that period (167 of 284) were so-called "excess issue." Excess issue items are items that are issued to inmates in fixed quantities by the institution itself—towels, clothing, cups, toiletries, and the like. If an inmate has more of such items than he or she should, the excess is contraband. Such items could not possibly have been smuggled into the jail by newly-arraigned inmates and would never have been recovered during an on-arrival strip search.

The remaining 117 items of contraband recovered included 34 instances of drugs, alcohol, or medicine; 31 weapons; and 17 cigarettes/tobacco. From the information I have been given, there is no way to know whether any of those items were smuggled in upon entry by new arrivals to the facility. More than half of the weapons found were makeshift weapons devised with materials found within OCCF. 9 of the weapons, for example, were sharpened pens, toothbrushes, toilet brushes, hairbrushes, or spoons; 3 were pens with sharpened wire, nails, or pins attached to them; one was a bent can lid; 7 were "metal objects,"

either unadulterated or somehow weaponized (by, for example, being sharpened or serrated); 4 were heavy gauge wires; and one was socks "rolled up into a hard ball underneath the inmates bad, which constitutes possession of an item that could be used as a weapon."

Capt. Ryan speculates that this wave of new contraband resulted from publicity about the *Dodge* injunction. However, there is nothing new about smuggling contraband into OCCF. Corrections Officer Cynthia Anne Fee testified, credibly, that "[t]he inmates at the OCCF regularly attempt to smuggle contraband into the facility despite the knowledge that they will be subjected to a visual body search at the conclusion of a contact visit." [Tr. 374]. Moreover, if post-July 26, 2002 newspaper publicity did encourage newly admitted detainees to take advantage of the preliminary injunction by trying to smuggle contraband into OCCF on arrival, then the data should show a correlation between the increase in contraband and the number of contraband items that were discovered during strip searches of newly-arrived inmates (many of whom were still strip searched). But there is no such correlation.

Indeed, the contraband reports in evidence reveal that, *in the 50 months following January 1, 1999,* contraband was recovered from the body cavities or undergarments of only 5 detainees during admission strip searches or "hygiene checks":

a. Inmate Raymond Cintron was admitted to OCCF on June 15, 2000 following his arrest for murder in the second degree. During the course of a "hygiene check" a plastic bag containing cocaine was recovered from his buttocks.

b. Inmate Lee Rivera was admitted to OCCF on December 27, 2000 following his arrest for aggravated unlicensed operation in the third degree and operating a motor vehicle left of the pavement. While conducting a "routine search," two packets of heroin fell to the ground while he was removing his underwear.

c. Inmate Edqin Guerrier was admitted to OCCF on July 7, 2001 following his arrest for driving while under the influence of drugs. While being searched in the Booking and Receiving area, he was ordered to spread his buttocks, bend over, and cough. A plastic bag containing marijuana was discovered protruding from his rectum.

d. Inmate Rasun King was admitted on November 20, 2002 following his arrest on a warrant for criminal sale of a controlled substance. While under an "admission search," a plastic bag containing cocaine fell from his boxer shorts.

e. Inmate Anthony Wright was admitted to OCCF on December 14, 2002 following his arrest for false impersonation. At the time of his admission to the facility, the booking and receiving officer noted that Mr. Wright appeared to be under the influence of drugs or alcohol and requested authorization to conduct a strip search. While Mr. Wright was exposing his buttocks for the officer's visual inspection, two bags of marijuana fell to the floor.

Of the approximately 23,000 inmates admitted to OCCF from January 1, 1999 through February 28, 2003, the County encountered three incidents of drugs recovered from an inmate's anal cavity and two incidents of drugs falling from an inmate's underwear during the course of a strip search. Only two of those five incidents occurred after the *Dodge* injunction and the resulting change in strip search policy. One of those two incidents involved an arrest for a narcotics crime and the other involved an arrestee who appeared to be under the influence of drugs. Under the "nature of crime charge" and "particular circumstances of the arrestee"

tests, it is possible that neither search would violate the Constitution. *See infra* p. 84. Indeed, it appears that there may have been reasonable suspicion to strip search four of these five detainees, based upon either the nature of the offense or the characteristics of the detainee.

So if the County had been in compliance with the Second Circuit's reasonable suspicion standard since 1999, it would arguably have missed—as a result of its compliance—only *one* item of contraband in the course of admitting 23,000 detainees. This nominal statistic is consistent with the experience of plaintiffs' expert, Robert De-Rosa, who testified that, while drugs are found on a regular basis during the strip searches of inmates returning from contact visits and in packages sent to prisoners, they are rarely, if ever, found during the new admission strip and body cavity search. [PX 40; Tr. 181].

During this same four year period, there was *not one incident* where a weapon was recovered from a newly admitted detainee's vaginal/anal cavity or undergarments. Defendants make much of razor blades recovered from an arriving inmate, Julio Morant, who was charged with a civil violation (a Family Court offense under Article 10). [Tr. 282–83]. An officer found a blade in the lining of Mr. Morant's sneaker while conducting a "general admissions search." [DX 1B]. Mr. Morant was then strip searched and three more blades were found in the left sleeve pocket of his jacket.

Defendants' reliance on this incident is misguided for two reasons. First, the strip search of Mr. Morant was lawful because reasonable suspicion existed—an officer found a razor blade in Mr. Morant's shoe before conducting a full strip search.

Moreover, Mr. Morant had been disciplined for assaultive behavior during previous incarcerations at OCCF and also written up for various types of contraband.[30] *Id.* Second, a strip search of Mr. Morant would not have turned up any additional contraband than a less invasive search would have uncovered—no contraband was found upon searching Mr. Morant's private parts. All were concealed in his outer clothing—his shoes and coat sleeve.

There is simply no evidence in this record from which I could conclude that newly arrived inmates were the source of the massive amounts of contraband recovered during the increased shakedowns that followed *Dodge.* In *Shain,* Judge Pooler suggested that newly-arrived inmates would be less likely than post-contact visit inmates to secret contraband, since they would have had no advance notice that they were going to end up at OCCF. *Shain,* 273 F.3d at 64. From the statistics cited above, it would seem that her surmise was correct.

### 6. Strip Searches other than On–Arrival Strip Searches

Booking and Receiving is only the first time when an inmate at OCCF might be strip searched. OCCF policy provides for strip searches under the following circumstances: (1) during a cell shakedown; (2) during a housing unit shakedown; (3) when an inmate is involved in an assault; (4) prior to an inmate's placement in disciplinary lockdown; (5) prior to an inmate's placement in the general population from the lockdown unit; (6) prior to an inmate's placement in a suicide prevention cell; (7) after an inmate's return from outside work detail;[31] and (8) after contact visits.[32] [DX 30].

---

**30.** Although it is not clear when the officers who searched Mr. Morant learned of his history at OCCF (i.e., before or after they searched him), it is clear that they had access to that information.

**31.** Whenever an inmate leaves the building and returns—whether to go out on a work

In addition, inmates are strip searched when officers have reason to believe that they may be secreting contraband. [DX 30, at 5.31(N); DX 29, at 4.4]. In *Murcia v. County of Orange,* 226 F.Supp.2d 489 (S.D.N.Y.2002), for example, a case also on my docket, OCCF officers strip searched plaintiff when they smelled cigarette smoke in the pen in which Murcia and others were housed. Because cigarettes are contraband, everyone in the area was strip searched when no one admitted to having the goods.

The legality of these types of strip searches is not contested in this proceeding and was not addressed in *Dodge.* So if, in reliance on the *Dodge* preliminary injunction, individuals increasingly tried to smuggle contraband into the facility after court visits, work details, or contact visits, their reliance was misplaced, since inmates could be strip searched following these activities without running afoul of *Shain.*

## CONCLUSIONS OF LAW

Plaintiffs seek to enjoin defendants from implementing their strip search policy insofar as it violates the Constitution. Defendants want no injunction, either because (1) their policies are not unconstitutional; or (2) plaintiffs have not demonstrated that injunctive relief is appropriate, particularly in light of the PLRA. In urging me not to award plaintiffs an injunction, defendants seek the discretion to strip search all newly arrived inmates.

■ Permanent injunctive relief is appropriate when a plaintiff (1) shows that an inadequate remedy is available at law, such as by showing that irreparable harm would result if an injunction were not granted, and (2) succeeds on the merits of his claim. *See Weizmann Institute of Science v. Neschis,* 229 F.Supp.2d 234, 258 (S.D.N.Y. 2002). Thus, the standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits. *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Sierra Club v. Hennessy,* 695 F.2d 643, 647 (2d Cir.1982); *Neschis,* 229 F.Supp.2d at 258.

■ In addition, where, as here, " 'public consequences' are implicated, it is incumbent upon a district court in exercising its discretion to 'balance [ ] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.' " *Sierra Club v. Hennessy,* 695 F.2d 643, 649 (2d Cir.1982) (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Congress codified this weighing of the hardships in the PLRA, which directs courts to give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the prospective injunctive relief. 18 U.S.C. § 3626(a)(2); *see Smith v. Arkansas Dep't of Correction,* 103 F.3d 637, 646–47 (8th Cir.1996) (finding that the PLRA "codifies existing law and does not change the standards for determining whether to grant an injunction"); *Gomez*

---

detail or to go to court—he or she is strip searched. As noted above, these strip searches take place in Booking and Receiving, and any contraband recovered from them is chalked up to Booking and Receiving.

32. OCCF contains a visiting area in which inmates sit across tables from visitors (other than lawyers, for whom there is a separate visiting area). Following all such visits, every inmate is strip searched. Such searches may be conducted on "less than probable cause." *See Bell v. Wolfish,* 441 U.S. 520, 560, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*v. Vernon,* 255 F.3d 1118, 1129 (9th Cir. 2001) (agreeing with *Smith* ).

■ Even if plaintiffs meet their burden of proof on these issues, the PLRA limits the type and scope of prospective injunctive relief that the Court may award plaintiffs. 18 U.S.C. § 3626(a)(2) states that no injunction shall issue unless the court finds that the relief is narrowly drawn, extends no further than is necessary to correct the constitutional harm found, and is the least intrusive means necessary to correct that harm. In a similar vein, the PLRA requires a court to apply principles of comity in fashioning relief that requires or permits a government official to exceed his or her authority under state or local law. *See also Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'") (quoting *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951)).

### I. *Irreparable Harm*

■ Plaintiffs allege that defendants maintain a policy of strip searching detainees arriving at OCCF that violates their Fourth Amendment right to be free from unreasonable searches and seizures. The alleged violation of a constitutional right suffices to show irreparable harm. *See Brewer v. West Irondequoit Cent. Sch. Dist.,* 212 F.3d 738, 744–45 (2d Cir.2000); *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996) ("[T]he alleged violation of a constitutional right [ ] triggers a finding of irreparable harm."); *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold

that no further showing of irreparable harm is necessary.").

### II. *The Merits of Plaintiffs' Claim*

As I described more fully in the findings of fact, I find that the policy OCCF officers have followed to determine whether to strip search a newly-admitted pretrial detainee has gone through three iterations: (1) a pre-August 2001 policy of strip searching every detainee admitted to the facility, which I have called a "blanket strip search" policy; (2) the policy from August 2001 until August 2002, pursuant to which newly-admitted detainees were automatically strip searched if any one of a set of listed factors existed; and (3) the policy from August 2002 until the present, where OCCF officers follow the written policy promulgated in response to the *Dodge* preliminary injunction. [DX 30].

Defendants argue that OCCF's pre-August 2001 blanket strip search policy—to which defendants openly profess they wish to revert—is constitutional. I disagree with defendants. *Shain* is controlling law in this Circuit, and the pre-August 2001 Policy to which defendants wish to revert clearly violates *Shain.* I also conclude that the two policies followed since August 2001 are also unconstitutional, but to a much more limited degree.

### A. *Second Circuit Jurisprudence on Strip Searches of Pre–Trial Detainees*

Second Circuit decisions on the constitutionality of strip searches of pre-trial detainees have followed a course that, to this reader, demonstrates considerable hostility to the practice of strip searching pre-trial detainees.

The journey starts with *Wolfish v. Levi,* 573 F.2d 118 (2d Cir.1978), *rev'd sub nom Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In that case, plain-

tiff Louis Wolfish represented a class of all persons confined at the recently-constructed Metropolitan Correctional Facility (MCC), a federal institution located in downtown Manhattan that housed pre-trial detainees (unconvicted individuals awaiting trial who could not post bail), sentenced prisoners awaiting assignment to another prison facility or who had been designated to serve their term at the MCC, sentenced prisoners transferred to the MCC on writs to testify or stand trial, witnesses in protective custody, and persons incarcerated for contempt of court. The plaintiffs' suit challenged a "litany of woes [that] touched on almost all aspects of the institution's conditions and practices," *id.* at 123, including the constitutionality of routinely strip searching inmates after receiving visitors. *Id.* at 131. Judge Frankel issued an injunction, *inter alia,* prohibiting "inspection of the genitals and anus unless there is probable cause to believe that the inmate is concealing contraband." *Id.*

On appeal, the Second Circuit recognized that an incarcerated individual "relinquishes some part of those rights to privacy and protection against unreasonable searches and seizures possessed by unincarcerated members of society," but found that "the existence of a realm in which privacy is safeguarded is fundamental to decent treatment of an inmate." *Id.* Thus, the court upheld Judge Frankel's order based on its determination that "[t]he gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility." *Id.*

The United States Supreme Court apparently shared the Court of Appeals' repugnance for strip searching—the Court stated that the practice "instinctively gives us the most pause"—but reversed the Second Circuit's ruling. *Bell v. Wolfish,* 441 U.S. at 558–60, 99 S.Ct. 1861. The Su-

preme Court assumed that upon their commitment to a corrections facility convicted prisoners and pretrial detainees retain some Fourth Amendment rights to be free from unreasonable searches. It explained:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. 1861 (citations omitted). The Court balanced "the significant and legitimate security interests of the institution against the privacy interests of the inmates," and concluded that the MCC could conduct the challenged strip searches—strip searching inmates after contact visits—"on less than probable cause." *Id.* at 560, 99 S.Ct. 1861.

Eight years later, in *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), the Second Circuit visited the issue of strip searches in a different context. The plaintiff in *Weber* was a misdemeanor arrestee who was strip searched upon her arrival at the Monroe County Correctional Facility, pursuant to a policy "calling for strip/body cavity searches of all arrested persons other than those placed in 'holding cells,' which are the cells in which arrestees are sometimes placed when their release on bail is imminent." *Id.* at 799. After her release, she sued for damages pursuant to 42 U.S.C. § 1983. The Court of Appeals ruled that "the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion

that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Id.* at 802. The Second Circuit also rejected the defendants' argument that qualified immunity shielded them from liability to plaintiff because (1) all the circuits that had addressed similar policies had found them to be unconstitutional, and (2) the Court had long stressed the intrusive nature of body cavity searches. *Id.* at 803.

Moreover, the court ruled that Monroe County's policy would be unconstitutional even if it only called for conducting body cavity searches on a newly arrested person who could not immediately make bail, and who was therefore moved from a holding cell to a cell near arraigned inmates. The court concluded that such a practice "would still not provide that 'particularized suspicion,' arising either from the nature of the charges and/or the arrest, which the law requires for so intrusive and demeaning a procedure as a strip/body cavity search." *Id.* at 802.

In rendering its decision, the Court of Appeals expressly found that *Bell v. Wolfish* did not "suggest, much less require," the district court's conclusion that Monroe County's policy was not unconstitutional. *Id.* at 801. *Bell v. Wolfish* did not "read out of the Constitution the provision of general application that a search be justified as reasonable under the circumstances," the court explained, and "[t]he imposition of a standard short of probable cause in determining the balance of interests at stake in *Wolfish* in no way dispensed with that requirement." *Id.* at 800. The Court of Appeals cited three factors that bore on the reasonableness of the strip search in *Bell v. Wolfish:* plaintiffs had already been arraigned, they had failed to make bail (and so were part of the general inmate population); and they "had

presumably chosen to receive visitors and to enjoy physical contact with them." *Id.* None of those factors was true of Weber, who was searched before she was ever admitted to the facility.

Two years later, the Circuit reaffirmed *Weber* in *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988). There, plaintiff Walsh was arrested pursuant to a bench warrant after not appearing at a hearing—albeit because the notice of hearing was sent to the wrong address—regarding his failure to pay parking tickets in Burlington, Vermont. Walsh was brought to the Chittenden County Correctional Center and processed in accordance with the jail's "standard intake process," which included a strip search and visual body cavity search. "There have been no doctrinal developments altering the principles noted in *Weber,*" the court explained, finding the "blanket policy calling for strip searches of all misdemeanor arrestees" to be unconstitutional. *Id.* at 69.

Despite the *Walsh* Court's pronouncement that there had been "no doctrinal developments" since *Weber,* the United States Supreme Court had issued a decision during the two years between *Weber* and *Walsh* that at least one judge in this Circuit believes "altered the principles" noted in *Weber. See Shain v. Ellison,* 273 F.3d 56, 70 (2d. Cir.2001) (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)) (Cabranes, J., dissenting). In *Turner v. Safley,* the Supreme Court articulated strict standards for determining the validity of a prison regulation claimed to impinge on an inmate's constitutional rights. The Court ruled that the relevant question was whether the regulation is reasonably related to legitimate penological interests, and that this question applied in all cases in which a prisoner asserted that a prison regulation violated the Constitution. *See Washington*

*v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (citing *Turner* ). The *Turner* Court listed four factors for a court to consider in answering that question: whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it; whether there are alternative means of exercising the constitutional right in question that remain open to prison inmates; whether accommodation of the asserted constitutional right will have an impact upon guards and other inmates and upon the allocation of prison resources generally; and whether there are reasonable alternatives available to the prison authorities. 482 U.S. at 89–90, 107 S.Ct. 2254.

Both *Weber* and *Walsh* were commenced by persons who were strip searched after arrest but prior to their arraignment. In 1994, the *Weber/Walsh* rule was extended (albeit *sub silentio* ) to a misdemeanor arrestee who was strip searched after his arraignment. *See Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir.1994). The plaintiff in *Wachtler* was one of this State's more celebrated misdemeanor arrestees—the then-Chief Judge of the New York Court of Appeals, who was arrested after an officer pulled him over for speeding and he refused to either answer any of the officer's questions without the presence of an attorney or produce a driver's license. The officer took Wachtler before the nearest available judge, who set bail at $250 after Wachtler continued to refuse to identify himself. Though Wachtler had almost $1,000 in his possession, he refused to post bail and claimed indigency. He was then brought to the Herkimer County Jail, where he was strip searched and placed in solitary confinement until a friend arrived to post bail approximately fourteen hours later.

The Court of Appeals did not reach the issue of whether the strip search of Wachtler was in fact unconstitutional, explaining that such a determination would require a record detailing all the circumstances surrounding the strip search. However, recognizing the subtle but important distinction between its facts in *Wachtler* and those of *Weber* and *Walsh*, the Circuit granted qualified immunity to the individual officers involved in the strip search on the ground that it could not find that the officers violated a clearly established right in strip-searching Wachtler given (1) the circumstances of the arrest—such as Wachtler's failure to identify himself at the scene of the arrest or in court, and his possession of $1,000 in cash; and (2) the lack of legal authority "that addresses the reasonable suspicion issue in circumstances even remotely similar to those in the instance case." *Id.* at 81–82. The court nonetheless declined to dismiss Wachtler's claim against Herkimer County, because "[i]f the standard procedure included routine strip-searches of misdemeanor arrestees, absent reasonable suspicion of weapons or contraband, and if no reasonable suspicion concerning Wachtler's possession of such items existed, then Wachtler would prevail." *Id.* at 82.

The *Weber/Walsh/Wachtler* trilogy was interrupted by a case in which the Court of Appeals reached a different conclusion, but on facts that varied from those of *Weber* and *Walsh* in three important respects. In *Covino v. Patrissi*, 967 F.2d 73 (2d Cir.1992), the plaintiff was not challenging a search of his person on arrival following his arrest for a minor offense. Having been arrested and detained pre-trial on a charge of kidnapping, Covino was incarcerated in Vermont's Northwest State Correctional Facility.[33] While a member of

---

**33.** The *Covino* Court did not mention the breakdown of the institution's inmate popula-

tion; for example, whether it housed mostly convicted inmates or pretrial detainees.

the general population, Covino was twice randomly selected for a visual body cavity search during random cell searches at the institution, and was then punished for refusing to consent to the searches. (Interestingly, Covino—whose circumstances might well have suggested that he represented a risk of carriage of contraband—was not forced to undergo the searches to which he objected, although he was disciplined for refusing). Covino brought an action seeking both Section 1983 damages and an injunction against the defendants' policy of conducting body cavity searches of pre-trial detainees. His motion for a preliminary injunction was denied by then-District Judge Fred I. Parker. Judge Parker's decision was affirmed on appeal, in a decision that never mentioned *Weber* or *Walsh* but relied exclusively on an analysis of the four *Turner* factors. One could fairly assume that the decision in *Covino* limited the reach of *Weber* and *Walsh* to what I will call "on arrival" searches—that is, searches conducted as part of the in-processing of a newly arrived defendant at the facility, whether pre- or post-arraignment.

Finally, the Second Circuit reaffirmed its adherence to *Weber/Walsh/Wachtler*—at least where misdemeanor arrestees are concerned—in *Shain v. Ellison*, 273 F.3d 56 (2d. Cir.2001). *Shain* was basically *Wachtler* redux, except that it involved a much larger incarcerative facility.[34] The plaintiff was a post-arraignment misde-

meanor arrestee who was searched on his initial arrival at the Nassau County Correctional Facility (NCCF), and who subsequently brought an action for damages and injunctive relief under Section 1983. The Second Circuit took *Shain* as an opportunity to restate that the law in this Circuit relating to strip searches of post-arraignment misdemeanor arrestees arriving at a New York county correctional facility was settled. Of particular significance for the case at bar, the majority in *Shain* rejected the argument that *Turner* had impliedly overturned *Weber*, stating that the Supreme Court's 1987 decision was limited to regulations at *prisons*. It distinguished *Turner* and *Covino* from *Weber/Walsh/Wachtler* on the ground that the two lines of cases involved different types of institutions—the former cases all involved a "state correctional facility or prison" ("a state or federal facility of confinement for convicted criminals, esp[ecially] felons"), while the latter cases each involved a "local correctional facility or jail" (a "place where persons awaiting trial or those convicted of misdemeanors are confined").[35] The court also noted that, in New York, misdemeanor arrestees are required to be admitted to bail, which minimized the penological significance of arraignment.

Judge Katzmann concurred in the result in *Shain*, but only because he felt that the felony/misdemeanor and jail/prison distinc-

---

**34.** The Monroe County Correctional Facility (*Weber*), the Nassau County Correctional Facility (*Shain*), and even OCCF (this case) are all rather large, multi-purpose correctional facilities serving populous counties. The Herkimer County Correctional Facility (*Wachtler*) serves one of the smallest counties in New York State. The Herkimer County Correctional Facility at any given time houses but a small fraction of those inmates residing in the county jail serving suburban Long Island. (After a recent increase in its capacity, HCCF is now able to house an average of fifty in-

mates a day. *See* Melissa A. Chadwick, *Herkimer County Approves Criminal–Monitoring Devices*, Utica Observer–Dispatch, June 12, 2003.) This difference, and any legitimate penological implications it might have, were not discussed in *Shain*.

**35.** The *Shain* majority failed to note that transfer to one of the state's prisons does not take place immediately upon conviction. Thus, New York's local correctional facilities also house convicted felons pending sentence.

tions reflected in Second Circuit jurisprudence bound him. He specifically noted that he was not sure if he would make either distinction were the issue before him for the first time. Judge Cabranes wrote a forceful dissent, in which he took the view that *Turner* had indeed impliedly overruled *Weber* and insisted that the majority's distinction between prisons and jails made no difference. Nassau County's request for *certiorari* was denied by the United States Supreme Court, *Nassau County v. Shain,* 537 U.S. 1083, 123 S.Ct., 672, 154 L.Ed.2d 582 (2002), leaving the district courts in this Circuit in the difficult position of having to determine the outer boundaries between *Weber/Walsh/Wachtler/Shain* and *Turner/Covino*—that is, where one line of precedent ceases to control and the other begins.

### B. *Background to this Particular Motion*

This Court's docket contains, or at one time contained, at least six cases challenging strip searches by law enforcement personnel. Since the decisions in those actions led to the filing of the current lawsuit, it is necessary to review what those cases are about—and what they are not about.

The first case was *Lee v. Perez,* 175 F.Supp.2d 673 (S.D.N.Y.2001). Plaintiff Lee was arrested for several misdemeanors. He was arraigned in the City of Newburgh City Court and released on $250 bail. A sum greater than $250 had been on his person when he was arrested and Lee should have been able to pay his bond and leave. However, a regulation in force at the time required him to post bail at OCCF. He was, therefore, transported to OCCF by Newburgh police officers for the sole purpose of posting his bond.

Upon arrival, he was strip searched. He was never admitted to the general population, and he was released as soon as he posted his bail. The undisputed evidence at trial demonstrated that the corrections officer who conducted the search had no basis to assume that Lee was carrying contraband. Under *Shain,* the strip search was illegal. This Court overturned a jury verdict in favor of the County, and I subsequently granted plaintiff's motion for summary judgment.[36]

In *Maneely v. City of Newburgh,* plaintiff Maneely represents a class of all prearraignment detainees who were strip searched at the City of Newburgh Police Department between March 27, 1998 and August 24, 2000. *See Maneely v. City of Newburgh,* 256 F.Supp.2d 204 (S.D.N.Y. 2003); *Maneely v. City of Newburgh,* 208 F.R.D. 69 (S.D.N.Y.2002). I recently denied plaintiffs' motion for partial summary judgment on the issue of whether the City of Newburgh maintained an unconstitutional policy of strip searching all prearraignment inmates with or without having reasonable suspicion to believe that those persons were carrying or concealing weapons or contraband.

*Dodge* was the next case in which a decision was handed down. That decision is described above. *See supra* pp. 50–51.

*Lee, Maneely,* and *Dodge* all dealt with persons who were accused only of misdemeanors, and who were strip searched upon arrival at an institution that the *Shain* majority recognized as a "local correctional facility or jail"—either a local lock-up (*Maneely*) or a county jail (*Lee, Dodge*). Thus, they all fell squarely within the parameters of controlling Second Circuit law.

---

**36.** It was necessary for plaintiff to move for summary judgment because there was no motion for a directed verdict, so the Court could not enter judgment in his favor at the time the jury's verdict was overturned.

Subsequent cases went beyond *Shain*'s factual parameters.

In *Murcia v. County of Orange*, 226 F.Supp.2d 489 (S.D.N.Y.2002), the plaintiff in Murcia did not arrive at the county jail accused of a misdemeanor. He was arrested on a federal warrant for bail jumping, which is a felony.[37] He, too, was strip searched on arrival at OCCF. He was subsequently strip searched two other times during his brief stay in the general population at that facility. He challenged all three OCCF strip searches as constitutionally infirm.

Analyzing the on-arrival search, this Court recognized that *Shain* did not address the precise fact pattern Murcia presented. Indeed, I noted that the *Shain* majority had stated in passing that "a New York felony defendant's post-arraignment detention *may well be* an indicator of an increased security risk." 273 F.3d at 65 (emphasis added). But I concluded that the Second Circuit was likely to apply the same standard—no strip searches on arrival at a county jail in the absence of reasonable suspicion to believe the defendant is carrying contraband—to felony arrestees. 226 F.Supp.2d at 494–95. I recognized that the mix of factors giving rise to reasonable suspicion might weigh differently in felony cases, but concluded that a felony arrest alone, without more, was insufficient to give rise to the requisite reasonable suspicion.[38] In reaching my decision, I declined the County's suggestion

that I ignore *Shain* in favor of their interpretation of *Turner v. Safley*.[39]

I did not apply the same analysis to a strip search of Mr. Murcia that occurred after he had been admitted to the general population. The search was conducted when corrections officers smelled cigarette smoke in the pen in which Murcia and others were housed. Cigarettes are contraband, and everyone in the area was strip searched when no one admitted to having the goods. I denied plaintiff's motion for summary judgment on this claim, because he sought judgment against a policy maker pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) but failed to establish that the strip search occurred pursuant to an unconstitutional policy. I drew a distinction between on-arrival searches and searches of individuals who had been admitted to the general population. I concluded that plaintiff had erroneously conflated the two. 226 F.Supp.2d at 500. That distinction is suggested by the different results reached in *Covino* (where the proposed searches would have occurred well after the inmate's arrival and incorporation into the population) and *Weber/Walsh/Wachtler* (all of which dealt with newly-arrived detainees). It is also expressly countenanced in *Shain*.[40]

The fifth case, *Sarnicola v. County of Westchester*, 229 F.Supp.2d 259 (S.D.N.Y.

---

37. The unfortunate twist in Mr. Murcia's case is that he was the wrong Mr. Murcia. He claims that he endured a total of four strip searches—one in the City of Newburgh and three at OCCF—before the mistake was uncovered.

38. I nonetheless dismissed the complaint as to Sheriff Bigger, the promulgator of OCCF's strip search policy, on the ground of qualified immunity, recognizing that *Murcia* extended the factual predicate for onarrival strip searches to a group of arrestees not consid-

ered in *Shain*—felony arrestees. Plaintiffs have moved for reargument of that decision.

39. Orange County first made this argument in *Lee v. Perez*. It has made the same argument (albeit in increasingly more sophisticated terms) in every case since.

40. Although a third strip search of Murcia took place at OCCF, the parties were not able to agree whether it was conducted by state or federal officials. That issue remains for trial.

2002), involved not just a different county (Westchester as opposed to Orange) but a different type of facility (the local State Police Barracks as opposed to a county jail). Nicole Sarnicola was arrested on suspicion of having committed a felony (criminal sale of a controlled substance) after driving a drug supplier to a deal site. She was taken to the barracks, strip searched, and then questioned. Sarnicola was never charged with a crime, let alone arraigned, and was released within hours of her arrest. At deposition, the officer who authorized the strip search admitted that he had no reason to believe that Sarnicola was secreting contraband on her person, despite having arrested her for possible participation in a drug crime. *Id.* at 271–72. Moreover, the decision to strip search her violated county policy that *all* strip searches following arrests be justified by reasonable suspicion of carriage of contraband—no distinction being made in the policy statement between felony arrests and misdemeanor arrests, or narcotics arrests and other arrests. I concluded that the strip search of Sarnicola, in a location where there was no conceivable penological interest (because she was in the equivalent of a police station), and in circumstances where the searching officer said he had no reason to believe that she was secreting contraband, was unconstitutional—even though she was taken into custody on suspicion of participating in a narcotics felony.[41]

In light of *Murcia* and *Sarnicola*, it came as no surprise when a group of plaintiffs, purporting to represent all felony pre-trial detainees strip searched at OCCF absent reasonable suspicion, filed suit under the caption *Rango v. County of Orange*, 02 Civ 8451 (S.D.N.Y.2002). The *Rango* plaintiffs sought to recover damages as a result of what they believe were constitutionally infirm strip searches, as well as preliminary and permanent injunctions on the order of the preliminary injunction that had been entered in *Dodge.*

It is the consolidated trial of the *Dodge* and *Rango* plaintiffs' application for a permanent injunction that forms the basis of this decision.

### C. *Shain Controls the Disposition of This Case*

Defendants argue that I should decline to find *Shain* dispositive of plaintiffs' claims. They do not attempt to distinguish *Shain* on its facts. *See, e.g., DiRienzo v. Philip Serv. Corp.,* 294 F.3d 21, 32 (2d Cir.2002), *cert. denied,* 537 U.S. 1028, 123 S.Ct. 556, 154 L.Ed.2d 442 (2002) (distinguishing cases because facts differed). Indeed, it is undisputed that this case and *Shain* involve precisely the same type of facility (a county jail) and precisely the same type of search (visual body cavity searches of newly-admitted post-arraignment pre-trial detainees). The only distinction, which I address below, is that *Shain*'s holding is limited to misdemeanor arrestees and does not, by its express terms, apply to felony arrestees.

Defendants couch their argument in terms of *stare decisis,* arguing that the doctrine of *stare decisis* is "flexible" and thus "this Court need not be constrained by principles of *stare decisis* to follow that decision." [Defendants' Post–Trial Memorandum of Law 15]. Defendants fail to distinguish, however, between horizontal *stare decisis* (whereby a court binds itself) and vertical *stare decisis* (whereby a higher court's decision binds lower courts). *See, e.g.,* Richard W. Murphy, *Separation of Powers and the Horizontal Force of*

---

**41.** If the officer in *Sarnicola* had not testified that he had no reason to believe that Ms. Sarnicola was secreting drugs on her person, the case might well have been decided differently. *See infra* p. 84.

*Precedent,* 78 Notre Dame L.Rev. 1075, 1085–86 (2003); Charles J. Cooper, *Stare Decisis: Precedent and Principle in Constitutional Adjudication,* 73 Cornell L.Rev. 401, 410 n. 6 (1988). It is horizontal *stare decisis* that is flexible—i.e., it is not an "inexorable command" or "a mechanical formula of adherence to the latest decision." *Lawrence v. Texas,* —— U.S. ——, 123 S.Ct. 2472, 2483, 156 L.Ed.2d 508 (2003) (internal citations omitted). In contrast, vertical *stare decisis* provides little, if any, leeway for a district court judge to stray from Court of Appeals precedent.

One commentator has developed a three-part typology of how a lower court might refuse to follow a higher court's precedent: (1) a lower court might ignore a higher court's opinion because of the lower court's view that the precedent was mistaken; (2) a lower court could conclude that the higher court's precedent has been undermined by later decisions to the point that it has been implicitly overruled by the higher court itself (or a court superior to the higher court), and is therefore no longer binding; and (3) a lower court might engage in predictive reasoning and refuse to follow a precedent the court believes the higher court would not still follow. Ashutosh Bhagwat, *Separate But Equal? The Supreme Court, the Lower Federal Courts, and the Nature of "Judicial Power",* 80 Boston Univ. L.Rev. 967, 971–72 (2000). Though courts and commentators have largely rejected all three of these as justifications for a lower court to not follow a superior court's precedent, defendants urge me not to follow *Shain* on all three bases.

### 1. *Allegedly Erroneous Factual and Legal Assumptions Do Not Provide a Basis to Reject Shain*

Defendants argue that I should reject *Shain* because the court there based its ruling on erroneous legal and factual assumptions, in particular assumptions about (a) the differences between jails and prisons, (b) the security risks misdemeanants pose to a correctional facility, and (c) the information that facilities have (and are able to obtain) about new inmates. In addition, defendants argue that there is no basis in the Constitution to import a reasonable suspicion standard into the context of pretrial detainees. Put bluntly, defendants argue that the Second Circuit made mistakes in *Shain* and I should therefore ignore that decision.

■ A lower court must follow precedent that is on point, however, even if it thinks the precedential decision was wrongly decided. *See, e.g., Jaffree v. Bd. of Sch. Comm'rs of Mobile County,* 459 U.S. 1314, 1316, 103 S.Ct. 842, 74 L.Ed.2d 924 (1983) (Powell, Circuit Justice). In *Khan v. State Oil Co.,* 93 F.3d 1358 (7th Cir.1996), for example, the Seventh Circuit Court of Appeals reversed the district court's holding, basing its decision on the Supreme Court's decision in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Chief Judge Richard Posner wrote for the majority and argued that the rule of antitrust law set forth in *Albrecht* was wrong as a matter of economic theory. 93 F.3d at 1361–62. The court of appeals felt itself compelled to follow *Albrecht,* however, because "*Albrecht* has not been expressly overruled (or, what would amount to the same thing, a later case, conceded to be indistinguishable, has not been expressly overruled)." 93 F.3d at 1363. On appeal, the Supreme Court reversed the Seventh Circuit, accepting Judge Posner's criticism of *Albrecht.* The Court stated, however, stated that "[t]he Court of Appeals was correct in applying that principle despite disagreement with *Albrecht,* for it is this Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan,* 522

U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

Thus if defendants are correct that the *Shain* Court based its ruling on erroneous assumptions, it is the Second Circuit that must rectify its own mistake. Absent that, the Supreme Court, which (regrettably) denied certiorari in *Shain*, must speak to the issue.

### 2. *Overton Has Not Implicitly Overruled Shain*

Taking a different tack, defendants argue that *Shain* is not dispositive here because the Supreme Court implicitly overruled *Shain* in *Overton v. Bazzetta,* —— U.S. ——, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Again, defendants are wrong.

Plaintiffs in *Overton* were a class of prisoners (and their friends and family members) challenging Michigan's rules restricting inmates' visitation rights. The Supreme Court applied the *Turner* factors and upheld the prison regulations, overruling the Sixth Circuit Court of Appeals.

Defendants fail to explain how *Overton* affects *Shain*. To the extent that *Overton* reinforced the Supreme Court's ruling in *Turner v. Safley* concerning judicial deference to prison regulations, that is precisely the issue on which the *Shain* majority and the dissent differed. I, of course, must follow the majority.

Moreover, *Shain* distinguished *Turner* by hewing to a carefully crafted set of what it perceived as critical factual distinctions between the two cases. *Overton* did not involve a facility of the type the *Shain* Court termed a "jail"[42]; it did not involve rules specifically regarding pretrial detainees; and it most certainly did not involve strip searches or plaintiffs' Fourth Amend-

ment rights. Rather, the Supreme Court applied *Turner* to *visitation* rules affecting *already-admitted* inmates at a facility that fell within the parameters of what *Shain* defined as a *prison*. *Overton* no more provides me with a basis to ignore *Shain* than *Turner* provided the *Shain* majority with a reason to overrule the *Weber/Walsh/Wachtler* trilogy.

### 3. *I Can Not Anticipate Whether the Second Circuit Will "Abandon" Shain*

Finally, defendants invite me to divine whether the Second Circuit will "abandon" its decision in *Shain*. They cite Judge Learned Hand's admonition that "the measure of [a lower court's] duty is to divine, as best it can, what would be in the event of an appeal ...." *Spector Motor Serv. v. Walsh*, 139 F.2d 809, 823 (2d Cir.1943) (Hand, J., dissenting).

In *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), however, the Supreme Court explained that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id.* at 484, 109 S.Ct. 1917. I see no reason why a district court should not show the same deference to the Court of Appeals that the Supreme Court demands of intermediate appellate courts. *See, e.g., Wisdom v. Intrepid Sea–Air Museum*, 1992 WL 168224, at *4 (S.D.N.Y. June 26, 1992) ("[Rodriguez's] admonition to the circuit courts should apply with

---

**42.** Michigan law distinguishes between county jails and state penal institutions. *Compare* Mich. Comp. Laws § 791.262 *and* Mich. Admin. Code r. 791.707 (2003) *with* Mich. Comp. Laws § 791.206 *and* Mich. Admin.

Code r. 791.1101 (2003). The visitation rules the Supreme Court addressed in *Overton*, Mich. Admin. Code r. 791.6609 (2003), do not appear to apply to county jails.

equal, if not greater, force to the district courts."); *Priester v.Senkowski*, 2002 WL 1448303, at *7 (S.D.N.Y. July 3, 2002); *see also Bloomer v. Costello*, 2001 WL 62864, at *5 (S.D.N.Y. Jan.24, 2001); *Distribuidora Dimsa S.A. v. Linea Aerea Del Cobre S.A.*, 768 F.Supp. 74, 77 (S.D.N.Y.1991).

The circumstances of this case counsel against "anticipating" *Shain*'s demise. First, it was decided only two years ago, and there have been no intervening Second Circuit strip search decisions. Second, the *Shain* majority was clearly uncomfortable about the institutional implications of contradicting prior Second Circuit decisions (in *Weber, Walsh,* and *Wachtler*) absent those decisions' being overruled *en banc* or by the Supreme Court. *See* 273 F.3d at 65–66, 273 F.3d at 69–70 (Katzmann, J., concurring). To urge a district court to do what a panel of the Second Circuit would not is to display a fundamental misunderstanding of the hierarchical structure of the federal judiciary. *See* Steven G. Calabresi & Gary Lawson, *Equity and Hierarchy: Reflections on the Harris Execution,* 102 Yale L.J. 255, 276 n. 6 ("The hierarchical structure of Article III dictates that inferior courts faithfully apply the precedents of superior courts, just as the hierarchical structure of Article II requires executive officials to follow presidential precedents.").

I agree that Judge Cabranes's dissent in *Shain* is most persuasive—the more so in view of the record in this case. The findings of fact set forth above suggest that at least some of the assumptions and distinctions made by the *Shain* Court are questionable, if not just plain wrong, and that defendants face very real potential security concerns from any new arrival. And it is hard for me to articulate a principled reason why an inmate cannot be strip searched without reasonable suspicion of contraband carriage when he arrives at OCCF but can lawfully be strip searched after a court date or during a cell shakedown on "less than probable cause." *See Bell v. Wolfish,* 441 U.S. at 560, 99 S.Ct. 1861. But the panel majority in *Shain* rejected Judge Cabranes's argument—which is, in essence, defendants' argument to me—and no subsequent Second Circuit or Supreme Court decision has overruled it. If the Court of Appeals wishes to "abandon" *Shain,* it must do so.

Having concluded that I may not ignore *Shain,* I turn to the constitutionality of OCCF's strip search policies.

### D.   *OCCF's Pre–August 2001 Policy*

■ OCCF's pre-August 2001 strip search policy—strip searching every arrestee admitted to the jail—violated the Fourth Amendment. It was precisely the same policy that was at issue in *Shain,* where the court found that persons charged with a misdemeanor and remanded to a local correctional facility have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons. Were defendants to revert to that policy, as they wish to do, they would be acting illegally.[43]

### E.   *OCCF's August 2001 Policy*

■ The August 2001 Policy, which was in effect until August 2002, is unconstitutional because it does not call for an officer to have individualized suspicion that a de-

---

**43.** In response to a query from the Court, defendants insist that they are not seeking a declaration that they can revert to the old "search 'em all" policy. However, they seem to feel that, if I decline to enter an injunction, they would be free to revert to that policy. [September 3, 2003 Letter to the Court]. I do not understand the logic behind their position. I could, for example, decline to enter an injunction because I found that the August 2001 OCCF policy was constitutional. Such decision would hardly imply that the prior policy was similarly constitutional.

tainee is secreting contraband on his person in order to strip search the detainee.

Under that policy, corrections officers strip searched arrestees who exhibited any one of a set of listed factors. Notwithstanding the use of the phrase "may search" rather than "must search" in the policy statement, the officer had no discretion to omit the strip search if one of the factors was present. The idea of the policy was to limit, if not eliminate, officer discretion. *See Dodge,* 209 F.R.D. at 67.

As I explained in *Dodge,* at least some of those factors, standing alone, were insufficient to establish reasonable suspicion that an inmate was carrying contraband or weapons. 209 F.R.D. at 72–77. Pursuant to the policy, for example, corrections officers could (and did) automatically strip search arrestees who appeared to be under the influence of alcohol. I fail to see how, all things being equal, a person who is under the influence of alcohol is more likely to be carrying a weapon or contraband than a person who is not under the influence. I suppose alcohol intoxication might create reasonable suspicion that someone is secreting alcohol on his person, and alcohol is contraband. But a person would be hard pressed to hide a bottle of whisky or can of beer in the areas of his body that only an Admissions Search (as defined above) would uncover.

Similarly, the August 2001 Policy directed officers to strip search newly-admitted detainees arrested for violating parole. At the *Dodge* hearing, defendants offered no justification for categorically searching that class of arrestees. 209 F.R.D. at 77. Unless a person violates his parole by using drugs or carrying weapons or being involved in some violent activity, I fail to see why he is more likely to be secreting contraband on his person than is any other person admitted to OCCF.

Of course, some of the factors listed in the August 2001 Policy might well suffice

to create reasonable suspicion standing alone. Pursuant to the policy, for example, officers automatically strip searched arrestees who appeared to be under the influence of drugs. Someone who is under the influence of drugs while being admitted to OCCF probably possessed drugs shortly before his arrest. In addition, drug intoxication can result from the ingestion of a small (and thus easily concealable) quantity of drugs. Thus, an officer faced with an arrestee who appeared to be under the influence of narcotics might well harbor reasonable suspicion that an arrestee may be secreting drugs on their person.

Similarly, on the record as it stands now, setting off the BOSS chair may, without more, suffice to create reasonable suspicion. At the *Dodge* preliminary injunction hearing, the evidence showed that new admittees were sent through the metal detector and asked to sit on the BOSS chair before they removed their clothing— or even emptied their pockets. They were then strip searched if they set off the alarm. 209 F.R.D. at 68. Between August 1, 2001 and February 14, 2002, 439 of the 731 documented strip searches at OCCF occurred because the inmate activated a metal detector. *Id.* at 73. Yet there was no evidence that contraband was recovered during any of those strip searches, let alone a significant number of them. *Id.* at 74. As a result, I found on a preliminary basis that simply setting off the BOSS chair was insufficient to establish reasonable suspicion.

The statistics about contraband recoveries in Booking and Receiving that plaintiffs introduced at the hearing demonstrate conclusively that little if any contraband was recovered in such searches—or put otherwise, the data suggest that the BOSS chair, as originally used, was a wildly *inaccurate* detector of contraband. So if the

same procedure were being followed with the BOSS chair I would have no reason to revisit my earlier conclusion.

At the trial, however, I learned that plaintiffs have changed their procedures relating to the BOSS chair. New admittees are no longer asked to sit on the BOSS chair while wearing their own clothes. Rather, inmates sit on the BOSS chair only after they have changed into an institutional jumpsuit, shedding most if not all of the paraphernalia that might activate a metal detector. As a result, it is possible that activating the BOSS chair is now sufficient to establish reasonable suspicion that an inmate is secreting contraband on his person.[44]

In short, the defect in the August 2001 Policy is that it does not limit strip searches to situations in a which a corrections officer makes an individualized assessment that a particular defendant presents a reasonably apprehended risk of carrying contraband. To that extent the policy is unconstitutional.

■ The policy also called for automatically strip searching all newly-admitted detainees who had been arrested on suspicion of a felony. The *Dodge* plaintiffs represented only misdemeanor arrestees, so I had no reason to address the issue at the preliminary injunction stage. But approximately two months after the *Dodge* injunction issued, I decided the parties' cross-motions for summary judgment in *Murcia v. County of Orange*, 226 F.Supp.2d 489, 493–95 (S.D.N.Y.2002). There, in the context of a Section 1983

action for damages, I concluded that it unconstitutional for OCCF to strip search newly-admitted inmates solely because they had been arrested for a felony. I noted the Supreme Court's statement that the distinction between felonies and misdemeanors is "minor and often arbitrary." *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (finding "the assumption that a 'felon' is more dangerous than a misdemeanant untenable"); *see also Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702 (9th Cir.1989) (finding Los Angeles Police Department policy requiring strip searches of all those arrested on suspicion of having committed a felony to be unconstitutional). And while the holding in *Shain* was limited to misdemeanor arrestees, nothing in that decision—or in any other relevant Second Circuit decision—indicated that being arrested for a felony created reasonable suspicion that an arrestee is carrying weapons or any other contraband. Indeed, the Second Circuit stopped short of addressing that issue. *See Shain*, 273 F.3d at 64.[45]

In *Murcia*, the defendants had offered no evidence that would justify a policy for searching all felony detainees. 226 F.Supp.2d at 496. They had not shown, for example, that felony arrestees were responsible for introducing more contraband than misdemeanor arrestees. *Id.* Defendants here have had the benefit of developing a record at a trial on the merits. Yet they still have not demonstrated that a justification exists for strip search-

---

**44.** The record does not contain any data that would allow me to draw any conclusion on that score.

**45.** In *Shain*, Judge Katzmann indicated his belief that Second Circuit jurisprudence distinguished between felony and misdemeanor arrestees—a distinction he was not sure he would make if it had not already been made

for him. 273 F.3d at 69–70 (Katzmann, J., concurring). I have looked for a definitive holding by the Court of Appeals to the effect that a felony defendant's post-arraignment detention is in fact an indicator of increased security risk. I found no such holding. Saying that post-arraignment felony detainees "may well" present an increased security risk is as far as the Circuit has gone.

ing all newly-arraigned felony arrestees. Indeed, defendants themselves argue that "[t]he undisputed record in this case demonstrates that misdemeanants and lesser violators may be *more* likely to secrete contraband ...." [Defendants' Post–Trial Memorandum of Law 11] (emphasis in original).[46] *See also Kennedy*, 901 F.2d at 713 ("A glaring omission from the LAPD's justification [for strip searching all felony arrestees] is any documentation (or even assertion) that felony arrestees have attempted to smuggle contraband into the jail in greater frequency than misdemeanor arrestees."). Absent such evidence, there is no basis for me to depart from the reasoning set forth in *Murcia*. I therefore find that defendants August 2001 policy was unconstitutional insofar as it called for strip searching all newly-admitted detainees arrested on suspicion of a felony.

### F.   *OCCF's August 2002 Policy*

■ The August 2002 Policy that was implemented post-*Dodge* lists factors that an officer may consider in determining whether reasonable suspicion exists that an inmate is concealing weapons or other contraband. Many of the factors listed are the same factors that automatically called for a strip search under the August 2001 policy, such as being a known gang member or having prior escape charges.

This portion of the August 2002 Policy complies with *Shain*—and cures the defect in the August 2001 Policy—because it does not direct officers to perform a strip search automatically when any one factor is present. Rather, it simply gives officers guidance about what they may want to

think about in determining whether reasonable suspicion exists. Thus, insofar as OCCF officers comply with these written dictates of the August 2002 Policy, defendants comport with the law's requirement that jail officers search only search newly-admitted pre-trial detainees if they develop reasonable suspicion based on "the crime charged, particular characteristics of the arrestee, and/or the circumstances of the arrest." 273 F.3d at 63.

Plaintiffs did demonstrate that officers on occasion strip searched newly-admitted pretrial detainees without reasonable suspicion. *See supra* pp. 58–64. The evidence plaintiffs presented at trial does not establish, however, that the August 2002 Policy exists only "on paper." While OCCF officers have fallen short of complying with their written policy and have strip searched some arrestees absent reasonable suspicion, I cannot conclude that they have fallen so short of their stated policy to suggest that they are systemically effectuating an unconstitutional policy. I believe that Capt. Ryan and his staff are attempting to comply with the August 2002 Policy, even though they do not like it.

However, the August 2002 Policy mandates strip searches of all detainees who have been arrested on suspicion of a felony, weapons, or narcotics offense.[47] [DX 30]. Plaintiffs do not contend that being arrested for a weapons or narcotics offense is insufficient to establish reasonable suspicion, but the *Rango* plaintiffs, who represent all pre-trial detainees strip-searched because they were arrested on suspicion of a felony, specifically challenge that portion

---

**46.** Though I do not credit the data on which defendants rely, they also argue that "the SRI reports at the OCCF show that misdemeanants and lesser violators are primarily responsible for the majority of the contraband incidents during the admission process."[Defendants' Post–Trial Memorandum of Law 11].

**47.** The policy also mandates strip searches of all sentenced inmates (both felons and misdemeanants) admitted to the facility, as well as all "weekenders" returning to the facility from their time away. [DX 30]. Plaintiffs here are all pre-trial detainees and do not purport to challenge these strip searches.

of the policy. I conclude, for the reasons stated above, that the August 2002 Policy is unconstitutional to the extent that it calls for an on-arrival strip search of every felony detainee without individualized reasonable suspicion that the detainee is carrying contraband.

### III. *Plaintiffs' Request for an Injunction is Granted*

Success on the merits is necessary but not sufficient to establish plaintiffs' right to injunctive relief. Plaintiffs must also show that the balance of hardships tips in their favor.

■■ Moreover, the PLRA mandates that I determine whether any injunctive relief I award plaintiffs is narrowly tailored. Unlike the requirement that the balance of hardships favor plaintiffs, however, the PLRA's tailoring requirement does not affect the availability of injunctive relief. Rather, it affects the scope of the equitable relief a court may order once that court determines that an injunction should issue. In other words, "[a]lthough the PLRA significantly affects the type of prospective injunctive relief that may be awarded, it has not substantially changed the threshold findings and standards required to justify an injunction." *Gomez v. Vernon,* 255 F.3d 1118, 1129 (9th Cir.2001); *see also Imprisoned Citizens Union v. Ridge,* 169 F.3d 178, 188 (3d Cir.1999); *Smith v. Arkansas Dep't of Correction,* 103 F.3d 637, 647 (8th Cir.1996); *Handberry v. Thompson,* 219 F.Supp.2d 525, 532–33 (S.D.N.Y.2002); *Jones 'El v. Berge,* 164 F.Supp.2d 1096, 1116 (W.D.Wis.2001).

Defendants argue that no injunction should issue, regardless of my findings concerning *Shain* and the constitutionality of OCCF's thereunder, because (1) the balance of hardship tips in OCCF's favor, and (2) it is not possible to fashion an injunction that complies with the PLRA. I address these arguments in turn.

### A. *Balance of Hardships*

■■ Plaintiffs would suffer a substantial hardship in the absence of an injunction. Having one's constitutional rights violated is, *a priori,* a substantial hardship. Moreover, the nature of this particular constitutional violation, being strip searched, represents a serious intrusion that is often humiliating, even when performed in the most professional manner. *See Bell v. Wolfish,* 441 U.S. 520, 588, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (stating that a visual body cavity search is a "practice [that] instinctively gives us the most pause"); *id.* at 576–77, 99 S.Ct. 1861 (Marshall, J., dissenting) (asserting that visual strip searches "represent one of the most grievous offenses against personal dignity and common decency"); *id.* at 594, 99 S.Ct. 1861 (Stevens, J., dissenting) (remarking that visual body cavity searches are "clearly the greatest personal indignity"); *Swain v. Spinney,* 117 F.3d 1, 6 (1st Cir. 1997) ("Our circuit has 'recognize[d], as have all courts that have considered the issue, the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities.'") (quoting *Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.1983)); *Chapman v. Nichols,* 989 F.2d 393, 395 (10th Cir.1993) ("It is axiomatic that a strip search is an invasion of personal rights of the first magnitude."); *Boren v. Deland,* 958 F.2d 987, 988 n. 1 (10th Cir.1992) ("One's anatomy is draped with constitutional protection .... [A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience."); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1446 (9th Cir.1989) ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."); *Mary Beth G. v. Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) ("strip searches involving the visual inspec-

tion of the anal and genital areas [are] demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"). Preventing the deprivation of plaintiffs' constitutional right to be free from unreasonable searches of this most intrusive form is of utmost importance to this Court.

As for the possible injuries defendants would suffer if I were to award plaintiffs an injunction: The PLRA specifies that I must give substantial weight to any adverse impact on public safety or the operation of the criminal justice system. This case is somewhat unique in that defendants have for the most part been applying a constitutionally-compliant reasonable suspicion standard since August of 2002 (with the exception of felony arrestees), so there is empirical evidence with which to assess any hardship defendants' would suffer by being enjoined to comply with *Shain.*

Defendants argue that they have suffered the following hardship since August of 2002:(1) substantially more contraband has been smuggled into OCCF, increasing the danger to inmates, corrections officers, and staff; (2) OCCF has had to expend more resources to comply with the August 2002 Policy; (3) OCCF has had to implement more pat searches in Booking and Receiving, which may increase the tension between inmates and officers; (4) OCCF has had to increase the number of cell shakedowns, which has increased tensions between the inmates and corrections officers and jeopardized officers' safety; and (5) OCCF is unable to comply with the reasonable suspicion standard.

I can dismiss defendants' argument that more contraband has been smuggled into the facility as a result of the August 2002 Policy. As explained in the findings of fact, the data belies this contention.

The resources defendants have expended in order to comply with the OCCF Policy include spending $10,000 on gloves for performing pat searches and stationing an officer in Booking and Receiving to assist officers in applying reasonable suspicion standard. I am, of course, wary of diverting OCCF resources; jail officials are best able to optimally disburse their limited funds. But defendants have not demonstrated that these two additional expenses have strained their budget or that the costs have been particularly onerous (at their new multi-million dollar facility).

I note that defendants would suffer similar hardship even if I did not enter an injunction. Absent a court ruling that OCCF need not comply with *Shain*—and as I have explained I am in no position to issue such a ruling—OCCF would expose itself to punitive damages in individual Section 1983 actions if it reverted to its past policy of strip searching all arrestees. Of course, one of the functions of punitive damages is to force a party to comply with the law. Thus, there exists a distinct possibility that OCCF would suffer the same hardship regardless of whether I issue an injunction.

Far more troubling is defendants' claim that increased tensions have resulted from an increase in pat searches and cell shakedowns. This is a penological concern of the first order. However, in support of this potentially troubling allegation defendants rely solely on (1) their expert's opinion that properly performed pat searches are intrusive in nature, [Tr. 444–45 (Camp Testimony)], and (2) Capt. Ryan's testimony that an officer was injured when an inmate attacked him during a cell shakedown in October of 2002. [Ryan Direct ¶ 35]. It a stretch and then some to infer from this either that tensions between inmates and officers have risen markedly since August of 2002, or that instituting a constitutionally-compliant strip search poli-

cy for new arrivals was the reason. Thus while I take this evidence into account in balancing the hardships, I do not weigh it as heavily as I would had defendants supported their allegation of increased tensions with more substantial evidence. And I note that there is no evidence that newly-arrived post-arraignment inmates are the source of any amount, let alone a great deal, of the contraband that is being recovered during shakedowns.

As for defendants' claim that they cannot comply with the reasonable suspicion standard: they argue that it is impossible for them to make an individualized assessment of reasonable suspicion because the officers stationed at Booking and Receiving lack the sort of information that would enable them to make a *Shain*-type assessment—information about the nature of the crime, the circumstances of the arrest and the particular characteristics of the detainee. To the extent that they do have information, they argue that it is inherently unreliable because it is self-reported.

As my findings of fact demonstrate, the officers stationed in Booking and Receiving lack information largely because jail officials choose not to procure it for them. No effort has been made to obtain information about the pending charges and about detainees from the arresting jurisdictions. While Capt. Ryan believes it would be impossible, he has no basis for so believing because he has never tried to do it. More significantly, booking and receiving officers are not even provided with information that is already available at OCCF—rap sheets and information about prior commitment history at the jail—that would assist the officers to perform their constitutional duty of assessment. There are none so blind as those who will not see.

The County's argument about the reliability of self-reported information is similarly unpersuasive. While there will doubtless be occasions when self-reported information turns out to be wrong, the County has offered no evidence that this happens with the frequency necessary to make such information inherently unreliable in the vast majority of cases. Indeed, because some number of new arrivals will never have had contact with the criminal justice system, OCCF will always have to rely on self-reported information to a certain extent, since there are no fingerprints in the system that can be used to check their identities.

I can well understand Capt. Ryan's desire to minimize security risks by strip searching all new arrivals at OCCF. He and his officers are charged with maintaining security. Security is a function of the information available. And no system can guarantee him perfect information about arriving inmates. But the way to minimize the risk is to make the most of the information that is available. Clearly, officials at OCCF, by their own choice, do not make the most of the information that is or could be made available to them. Until they do, they cannot complain about the limitations of an imperfect information system.

Last, I must address whether changing defendants' August 2002 Policy to extend the "individualized reasonable suspicion standard" to newly-admitted accused felons would work an unreasonable hardship on defendants. Since no evidence before me suggests that felony arrestees are more likely than misdemeanants to attempt to smuggle contraband into the facility (indeed, as noted above, defendants contend the opposite), I cannot find that an injunction to obey the law would create a hardship.

I conclude that the balance of hardships tips in plaintiffs' favor.

### B. *The Scope of the Injunction*

I reject defendants argument that the PLRA would be violated by issuance of an

injunction. I am mindful that the PLRA requires me to find that the injunction is narrowly drawn, extends no further than is necessary to correct the constitutional harm found, and is the least intrusive means necessary to correct that harm. But the PLRA's mandate to narrowly tailor injunctive relief does not eliminate courts' ability to issue injunctions. *See, e.g., Imprisoned Citizens,* 169 F.3d at 188 ("Under the PLRA, courts retain authority to adjudicate constitutional challenges and grant equitable relief to remedy constitutional violations.").

I hereby enjoin defendants from strip searching (as defined above) newly-arrived pre-trial detainees upon their initial admission to OCCF unless officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest. I cannot imagine an injunction that is narrower, less extensive, or less intrusive (while correcting the constitutional harm). I am not mandating any specific actions defendants must take. Rather, I am telling defendants that they must adhere to the reasonable suspicion standard set forth in *Shain*

before strip searching any newly arrived inmate. It is entirely up to defendants how they will comply with the law.[48]

As a practical matter, complying with the injunction will mean continuing to comply with the August 2002 Policy except in one respect: OCCF officers can no longer strip search newly admitted detainees simply and solely because they are charged with a felony. I leave it to defendants' discretion to change the written policy to reflect this change, and to ensure that OCCF officers act accordingly.

## CONCLUSION

Plaintiffs' request for an injunction is granted. My order granting plaintiffs an injunction is directly appealable to the Second Circuit pursuant to 28 U.S.C. § 1292(a)(1), even though the plaintiffs' claims for damages remain to be tried to a jury. *See Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1175 (2d Cir.1995); 16 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 3924, at 146 (1995). If defendants intend to take an appeal, the Court will stay further proceedings pending the determination of that appeal.

This constitutes the decision and order of the Court.

---

**48.** As I learned at the trial, New York City has chosen to balance security concerns and comply with *Shain* by acquiring hospital gowns that inmates wear when they bend over and cough. The maneuver dislodges the contraband while the gown protects privacy. [Tr. 393–94 (Fraser Testimony)]. I am not ordering OCCF to follow this or any other procedure, but Capt. Ryan and his staff may wish to consider it as one alternative method of complying with this injunction.